*State of Oregon v. Yovko v. Northwest Trustee Services*
Case No. C110703CV
Transcript of April 25, 2011 Court Hearing
707220.0032

| | |
|---|---|
| JUDGE: | I'll let you begin. |
| MR. BOWLES: | Thank you, Your Honor. Your Honor, we're here today to seek a preliminary injunction on a TRO that was awarded pursuant to a civil case that sought to stop a trustee sale on a foreclosure sale of the plaintiff's home. |

As a preliminary matter, Judge, the plaintiff's daughter, who we will call as a witness is in the hallway outside. She speaks English, she's dealt with the loan servicer, and it's by virtue the fact that her English is just— was the better communicator with the native English speaker, and so she has personal knowledge of all of the events, Judge, that we are prepared to offer testimony on.

Insofar as the injunction, Judge, this is a situation that is ripe for issuance right now, even though the sale has not been held. And the reason being, Judge, is that—under a nonjudicial foreclosure proceeding, there is a presumption that they will follow the statutes strictly, and this is conducted outside of the purview of the court. If it failed to do that, Your Honor, there is no one else out there to oversee this process but for say filing a TRO or contending with the result after the sale.

In the event that a trustee holds a sale and conveys that interest under 86.780, the statute would basically provide that the recitations of ownership are prima facie and conclusive providing that it goes to [unintelligible at 9:57:16] FD without knowledge of the claim to defensive of competing claims.

If the plaintiff were unable to file a TRO and seek a preliminary injunction prior to the occurrence of the sale, according to the defendant's reasoning, is that we would be locked into them, having a sale occur—a conveyance occur—and then the only issue then would be whether or not our clients were entitled to damages, not whether they are entitled to save their home. And so consequently, once this nonjudicial proceeding has begun—or excuse me, the nonjudicial foreclosure sale process has begun, the plaintiff has been placed in a situation where they are either forced to accept the consequence of the sale or initiate an action in which to stop it based on the acclament outcome of what a sale would mean. If the Court were to accept that they are locked into accepting the consequences of a sale, they cannot get a preliminary injunction prior to the sale, then that would presume that the only relief that the plaintiff is entitled to is one for damages, and we would respectfully say that is not the intent of the legislature.

EXHIBIT  10
PAGE  1

Furthermore, Your Honor, the question here for the Court is not necessarily one of whether they can foreclose, but have they followed the statute as it directs if the sale must occur. Namely, those are under 86.75 sub sect—86.735(1), whether or not any assignments and all assignments have been recorded as the assignment of deed of trust within the public record. The second component under 86.735(2) is whether or not there is a default.

Your Honor, in the deed of trust MERS and I'm—I'm—I'm not sure if the Court has kept abreast of what is happening across the country with MERS, but MERS, as a party to this lawsuit is claiming that they a beneficiary under the deed of trust. MERS, just for edification and the Court's benefit, MERS is a private company which was formed in its own by members of the Mortgage and Real Estate Industries, such as Bank of America, AIG, SunTrust, all of those entities have created this private company that purportedly was created for the purpose of electronically tracking the assignments of interest on mortgages.

That—the—the reasons behind this, as stated on the MERS web site, is that it was for the purpose of saving the mortgage industry of having to pay the filing fees when they, excuse me, the recording fees each time they would record these assignments. And so effectively, Judge, what we have here is a private entity that has stepped in to replace the public recording statutes. The—the—the benefit to the real estate industry for the creation of MERS was to facilitate the transfer and the secondary market of loans and securitization and the sale of those loans on a secondary market. By not having to record each and every assignment, MERS has purportedly stepped into the position of being a beneficiary and they can—they—they essentially have treated it as if they are having a whole series of endorsements to the note, the holder of the note remains unknown, but MERS steps into place and says you're the only party that you have to deal with. Essentially MERS has erected a curtain and the borrower is forced to deal with who MERS delegates as the owner of the note, and that's incorrect, Judge.

MERS is not a beneficiary under the deed of trust, even though it says it is the beneficiary. It hasn't paid any value for the note, Your Honor. It is merely an entity out there that may, at best, act as an agent of the beneficiary. And if that's the case, we have an assignment from Sierra Pacific Mortgage, the originating lender and an eventual assignment to HSBC, which is the secured past trust, Judge. If we are to assume for argument's sake that HSBC owns that note and that the assignment, excuse me, the recording of assignment of the deed of trust is accurate, then there are un, excuse me, that they, excuse me, the assignment of deed of trust that they allege from Sierra Pacific to HSBC is—is as they allege there are unrecorded assignments, and here's why, Judge. The securitized trust of which HSBC is the trustee, has a Pooling and Servicing Agreement, which dictates how loans are transferred into the

2

EXHIBIT _10_

PAGE _2_

trust, and that the transfer of those loans have to occur through a certain process, namely they have to [unintelligible - 10:02:45] that the as the originating lender, Sierra Pacific, the PSA provides that the loans must be transferred to a separate entity referred to as DB Structured Products, Inc. That sponsor then conveys the loan to a depositor, a purchaser, which is Deutsche Alt-A Securities, Inc.

Judge, if you could refer to our exhibit 10, the Pooling and Servicing Agreement and servicing agreement. Page 34 under the PSA provides that the assignment or the endorsement of that note would transfer to the sponsor or the seller DB Structured Products, Inc. The second conveyance, Your Honor, would be from—would be from the sponsor/seller to the depositor/purchaser which is Deutsche Alt-A. Provisions under the PSA for that transaction are on page 15.

Finally, it is conveyed to HSBC as trustee for Deutsche Alt-A Securities Mortgage Loans Series 206 AR-1, and that is provided for on page 35. Your Honor, each and every one of those conveyances must occur for a particular reason. The securitized trust is a conduit taxation vehicle. The IRS is very rigid in how it treats the transfer of assets into that securitized trust. The conveyances to the depositor or DB Structured Products, Inc., and again to Deutsche Alt-A Securities, Inc. are tran—they are conveyances that occur to protect the assets of the trust in the event of a bankruptcy. So they are complete conveyances. But those conveyances, Your Honor, are not recorded in the public records. Why? Because MERS is holding itself out as the beneficiary and stands in place of all of them and none of those recordings under the assignments of the deed of trust have occurred. Those transfers of interest, Your Honor, have to be recorded. They were not. There is no successive recorded assignments between any of those parties, and that's in violation of 86.735(1).

And if you will see the section one of the mortgage loan purchase security—purchase agreement of the PSA, whereby seller conveys to purchaser, the mortgage loans as of the closing date 1/31/06. And I—I direct the Court to page 154 of the PSA. These assets, Judge, have also—are required to be transferred to that trust according to strict timelines. Those assets have to be transferred to the trust within the closing date, in this case which is 1/31/06. In the event that a loan becomes nonconforming, say it goes into default, they have a two year window from the closing date in which to replace that loan with a conforming loan.

All of these events, Judge, would have to occur well prior to the assignment that they recorded on May 29 of 2009, when they said that the loan—the assignment of the deed of trust recorded from Sierra Pacific Mortgage to HSBC. That is failing to take into account all of the intervening entities that had to be assigned to and recorded those conveyances, they're not in public record, and they are outside the timeframe by which this asset could have been transferred to the trust.

3

EXHIBIT 10
PAGE 3

The trust is governed by New York law, Your Honor, and in the event that this asset is not transferred or the formalities are not followed according to the terms of the PSA, then the conveyance fails.

So, in looking at—and I understand, Judge, that this is going from the macro to the specifics, but in the event that those assignments were not properly recorded, then all of the successive events that have occurred, such as the party that's claiming that they can assign the deed of trust to a successive—to a successive trustee to the successive trustee in this case, Northwest Trustee Services, which alleges there is a default and issues a default. All of those events failed. They failed because they didn't have any power at the time that those purported documents were executed. They have no basis; they have no impact on the foreclosure process.

Furthermore, Judge, in looking at the—I'm looking at the actual assignment of the deed of trust, which occurred on May 29, of 2009, the assignment is purportedly a [unintelligible at 10:09:24] between Sierra Pacific Mortgage to HSBC when Sierra Pacific Mortgage had no interest in which to convey at that time. If this asset were properly transferred to the trust and it's subject to the rules of the securitized trust, then it has to be timely transferred to the trust. All the entities, the interceding entities, have to be properly recorded in public record. The timing of those recorded assignments of the deed of trust have to relate to when the endorsements of that note occurred, when the sale of that note occurred to these other parties, namely the sponsor to the depositor to the trust, as opposed to going from the originating lender all the way to HSBC.

In addressing the position that MERS is describing itself as a beneficiary, under the deed of trust, MERS referenced itself as the beneficiary. They cannot be a beneficiary. The beneficiary on this case is the originating lender. We would—we would—my client takes the position that MERS is an agent of the beneficiary. Why is that significant, Your Honor? They cannot exceed the powers of the principal as an agent, and by cloaking themselves as a beneficiary just because they call themselves a beneficiary does not mean that they are the beneficiary. Under a deed of trust, Your Honor, that enables them to conduct a nonjudicial foreclosure sale. In the event that there is a default, it is the trustee which assign—which—which essentially conducts the nonjudicial foreclosure process, and the beneficiary is the originating lender. MERS does not have legal title as they choose to assert. That is a power that is delegated to the trustee, the power of sale. 86.705(1) and (5) address that the trustee has the power of sale, but the beneficiary, Your Honor, does not. And MERS cannot act as both a beneficiary and a trustee in the process of assigning these interests. They have to be separate. They can act as an agent of the beneficiary, but they can't assume powers beyond the original beneficiary. So when that deed of trust was assigned, Sierra Mortgage had no interest in which to assign. They—there's nothing for them as an agent of the beneficiary in which to assign. They couldn't

4

EXHIBIT _16_
PAGE _4_

step into the role of the beneficiary, because they weren't the beneficiary.

What should have happened is that each and every one of those assignments from the sponsor to the depositor to the trust should have been properly recorded. And MERS could act as the agent for each of those transactions, provided they were done in a—in a timely manner, and that's what the sale of the note [unintelligible at 10:13:13] rate into the securitized trust.

Your Honor, under 86.790, MERS also does not qualify as a trustee, and that's where the exception for them to operate as the trustee, because they are neither an attorney, nor a financial institution, nor a trust company or a title company, United States or one of its agencies, or an escrow agent. And so, again, MERS can't step into the shoes of acting as a trustee because they're precluded by statute. They can't act as a beneficiary just because they name themselves to be the trustee. That's the, you know, that's the example of an [unintelligible at 10:14:26] Your Honor that just because they say so, it is so, and that's not the case. The statute is very, very clear about that. You can't have a beneficiary and a trustee in the same position.

Why are we in this position, Your Honor? My client, some months back, had requested a loan modification from her loan servicer, ASE, and as the case in many households, there is almost a marketing of this of a [unintelligible – 10:15:17] benefits to the loan modification by the loan servicer when these people begin to experience problems with their loan. Documents are sent out. What should take just a mere few months in which to do the calculations to see whether or not they comply for the trial modification program, ends up being a process that drags on for months and months and months until finally, it appears that the loan servicer says, "you're not going to get your loan modification, and here's your default." And today we're going to present evidence, Judge, that the default notices that they sent out are grossly exaggerated when you look behind and go into the trust and you see what they were representing was due to the investors of that trust.

Those default notices, Judge, have to have a degree of accuracy if that's what they are going to do, if they are going to declare a default. And if they are grossly inaccurate, then they fail to comply with the statute of providing a default notice that the homeowner is obligated to cure. Grossly overstating the amount that they must cure effectively renders the whole purpose of having to pay off a mortgage moot because then a—a—a loan servicer or a trustee can just pick any figure that is beyond the means of the homeowner and make a demand, they don't pay, they get their home foreclosed on, and that's it, that's the end of story. They move out, and then it's their case to make it for damages before the Court in a subsequent suit.

5

EXHIBIT _10_

PAGE _5_

In our present case, what happened is they applied for a loan mod, and the bank sent out various default notices that were grossly overstated. My clients were given assurances that their loan modification was in the process of review all the way up until the point and time of the sale occurring, and when they saw that the sale was still continuing on, even though they were given assurances that a loan mod was going to occur, whether it was in process, and this is a statement being made by the loan servicer. At the last moment, on the day of the sale, they were filing Chapter 13 to stop the sale, and this happened twice. And the statute, Your Honor, provides that the sale must occur within 180 days. On the last event that this occurred, this is a Chapter 13, there was two days left after the stay was lifted, and the loan servicer, excuse me, the trustee sent out a supplemental new notice that extends beyond the 180-day period. The statute is—is strictly construes that 180-day period, Judge, because if it wasn't a hard and fast rule, the servicer and the trustee could just issue a new notice at any point in time after the stay of a bankruptcy is lifted, and regardless of how much time has passed in the in summing period, they could continue on as if the 180-day period [unintelligible – 10:18:45]-tained. Thank you, Judge.

JUDGE:

Who wants to go for your side?

MR. PRATTE:

Good morning, Your Honor. My name is Bob Pratte. I'm with DLA Piper. I'm admitted here, pro hac vice, with my counselor Pilar French, from the Lane and Powell.

I'd like to start with, I think, addressing a couple of preliminary issues, I got a little bit—I get a little bit lost, so I'd kind of like to go back to the basics a little bit on the injunction standards. I think that the test in granting the injunction is pretty well known. It's the irrevocable harm, the public interest, the likelihood of success, and the public policy, and I think on those four standards I'm going to take a little bit of issue with what opposing counsel said starting with a very basic question about losing the home. I am not—I'm of the opinion that it's not her home since the address that she gives for notices is not the property address, and I think Ms. French will address that a little bit later.

The harm issue here, we're not here because of a HANT modification, we're not here because of anything. We're here, really for a very simple reason, plaintiff has not made a mortgage payment in two years, and any harm that's done is occasion by her not making the payments. If you make the payments, if you honor an obligations then it's going to be made. It appears from the review of the record that there were some screw-ups in the servicing of the loan, back in '05 when the loan was originated, there were some problems with the escrows. It is my understanding that those have been resolved, that those have been cleared up. I actually agree with opposing counsel that, if in fact the records that are—that are provided in terms of what is owed are incorrect, that is problematic. I think for my purposes I'm going to assume that they are

6

EXHIBIT __10__
PAGE __6__

at this point, that they are in fact, correct. I don't think there's irrevocable harm. I think there's perhaps, inevitable harm, because if she chooses to not make mortgage payments, or she is unable to not make mortgage payments, at some point in time, she is going to lose the house. Whether it's by foreclosure or by advertisement foreclosure by judicial action, she's going—she's going to lose the house.

I think the public interest needs to be served as well. The plaintiff borrowed $334,000 back in '05 on an adjustable rate loan. The rate was 5.875 percent. That makes the monthly payments of just principal and interest about $2,000 a month. According to the affidavit they submitted, their real estate taxes were about $300 a month back then in '05. She hasn't honored the obligation to pay back that money. It's really quite simple. I think one of the big public interests is honoring your obligations and the sanctity of contracts, and I think that public interest needs to be served. I think what we have here is really a hijacking of what was supposed to be a simple, efficient default remedy that the Oregon legislature created for lenders. Oregon's had a judicial foreclosure action for a good long time, it's my understanding at least for a long time, it allowed deficiency judgments. The trade-off on the foreclosure by advertisement, it doesn't allow deficiency judgments.

I think the other, pardon me, I think the other standard of the—for granting the injunction is the likelihood of success. Again, I think on the foreclosure, in some ways, it is completely in her control. If she makes the payments, she can avoid the foreclosure, so that likelihood of success on the foreclosure can be high or can zero, depending on she makes the payment or not. I think on the MERS issue, which I'll address in more detail, I think the likelihood of success there is—is very—is very slim.

The balance of harm. It's hard as lender's counsel and MERS' counsel to talk about the balance of harm when you're talking about one loan in a lender's portfolio. At the same time, as we can see by looking at the court dockets in Oregon, this problem is compounded by repetitive filings, people keep trying new theories, throwing stuff at the wall to see what they can get to stick, to basically delay a foreclosure. And—and so I think that there—there is—there is some harm. Our client is losing money every day, not getting paid. I think if an injunction were to be granted, I certainly hope it would not, I think there's an absolute minimum the borrower should be required to pay the full amount of the mortgage, so that at least there is a standstill. And I think the Oregon injunction rules provide for basically a standstill if an injunction is going to be granted, and I think that would—I think that would be fair.

Looking at the merits of the case Oregon's deed of trust statute is really very simple, and maybe because I'm a real estate lawyer by training and a litigator by accident, maybe I find it easier to read, but it's—it's very simple, straight-forward. It establishes a low-cost, efficient, alternative to a really cumbersome judicial process. Now what does it require? It

707220.0032/5074280.1

EXHIBIT __10__
PAGE __1__

simply requires that a specified notice be given when there is an event of default, and it goes into advertisement. What it requires by way of assignments is that any assignment by the beneficiary or the trustee of the deed of trust be recorded. We agree with that, we think it's absolutely clear, and we submit there have been no unrecorded assignments by either the beneficiary or the deed of trust. Plaintiff's counsel challenges the ability of MERS to serve as a beneficiary under Oregon statutes. They say we're self-appointed. Actually, we're not self-appointed. Ms. Yovko actually granted us that interest in the deed of trust. It specifically names MERS as a beneficiary in the deed of trust. It also identifies the capacity in which MERS serves as the beneficiary of the deed of trust. It does it in a fiduciary agency capacity. It is the nominee of the lender, and I am fairly certain that when Oregon's legislature enacted the deed of trust statute, they were not intending to reverse hundreds of years of agency law in the state of Oregon, and I think that's very clear. 87.705(i) also provides a very simple, straight-forward definition of a beneficiary. It is not rocket science. It says, "it is the person named or otherwise designated in the deed of trust as the person from whose benefit the deed of trust is given." There's no Litmus paper test for who can really, really be a beneficiary or who can't be a beneficiary, there's only two, but there's only one statutory provision for who a beneficiary can't be. The beneficiary cannot be the same person as the trustee unless that entity also has appropriate trust powers. We don't have trust powers. We're not an attorney; we're not a national bank. We are indeed a Delaware corporation, organized under the laws of the state of Delaware. We don't purport to be a trustee. I have no idea where the argument is coming from that in some way we represented ourselves to be the trustee. We are absolutely, not never the trustee. We don't purport to be the trustee. As the beneficiary on the deed of the trust, one of the powers we have is to appoint a trustee or a successor trustee. That is a contractual and statutory right that is given to us under the deed of trust. The only other qualification for being a trustee, which I think is an implied qualification, which I think is inherent in any kind of—any kind of a statute like this, is that MERS must have the requisite ability to contract. So if you're going to put another test on who can be a beneficiary, you'd have to say, well, you know, you can't be a minor. I'm not sure what the age of contract is in Oregon, but it's 18 in Minnesota, where I'm from, so you'd have to be a person over the age of 18, have legal capacity contract, you know, not be infirm by health or a mental reason. And corporations, entities can certainly be—can certainly be trustees. So I think from that standpoint, we meet the definition of a beneficiary, and I think the case law, even what I will call the case law that is not going in the right direction in Oregon all the way, I think even that case law recognizes the fact that MERS can be the beneficiary under the deed of trust. And I submit, Your Honor, that once, if you can answer that question in the affirmative and I—and I think you can and

8

EXHIBIT ___10___

PAGE ___8___

should and can easily do so. I think that actually gets rid of about 99 percent of the issues in this case. Putting aside totally for the moment, any issues about the exact dollar amount that's owed or what, just talking about now the legal arguments on the foreclosure process, compliance with the deed of trust, whether MERS can serve as beneficiary.

If you can lawfully be a beneficiary under the deed of trust, okay, you can do whatever any beneficiary can do. We don't have special purpose beneficiaries, there isn't a beneficiary that can only do things a certain day of the week or in a certain [unintelligible - 10:29:16]. If you're the beneficiary, you're the beneficiary. You have all of the powers that are granted to a beneficiary under that deed of trust. I'm not aware of any statute in Oregon which would prohibit MERS being a beneficiary on the deed of trust, and I think some [unintelligible at 10:29:34] find a case out there that I haven't seen yet, but—and I think the case law supports that as well.

And I think to understand that, you almost need—it's almost like going back to—for me, it's almost like going back to law school, my first days in real estate practice. What is the purpose of recording a deed of trust in the first instance? It's not to benefit Ms. Yovko. She knows she owes the money, she signed the note, she [unintelligible – 10:30:08]. The—the purpose of recording a deed of trust or any security instrument—it's not a consumer protection statute, it's not to protect the borrower, it's to put the third-world on notice, outside parties that someone has a lien on this property and puts them on a duty of further inquiry into that. That's the—that's the sole purpose of it. As between a borrower and—and—and a—and a lender and a mortgage state of mortgage mortgagee, a deed of trust, they know their rights. They're set out by contract. It's really quite clear. The recording statutes are there to put the outside world on notice of the interest. That's the exact same reason that the Oregon deed of trust statute also requires that intervening assignments of the deed of trust by the beneficiary or the trustee be recorded, because if someone takes title from a foreclosure through the trustee or through the beneficiary, they need to know that they got a title from the person who is of record title. If someone comes in and wants to search title in the grantor/grantee indexes in Oregon to that property, that's what they will find. They will find those parties. Again, it's not to inform the borrower about who he/she makes her mortgage payments to. She knows that. We have federal statutes, RESPA that says you will be notified of transfer of servicing. There was an amendment to the Truth in Lending statute in '09 I believe, that requires that the servicer inform the borrower of who the investor on the loan is, which you know, the number trust somewhere.

What the Oregon legislature did not do, and to the best of my knowledge, no legislature anywhere in the country has done, is require that transfers

9

EXHIBIT 10
PAGE 9

of interests in the promissory note somehow get recorded in the county of land records. That is simply not the case. It has never been the case in any state.

What we're mixing up here are two fundamentally different areas of law. We have the law of negotiable instruments and the UCC, typically Article Three or Article Nine, and we have real estate law, which governs deeds of trust, mortgages, and the like. I think what plaintiffs are doing—and not just these plaintiffs—but I think in other cases, and I think—and I think where some of the courts are getting confused is they're con—they're mixing up the concept of the negotiation or transfer of an interest in whole or in part of a promissory note. The obligation that the security stands the security form with transfers of interest in the mortgage or the deed of trust. I will grant you I think that some of the language and some of the instruments is sloppy. I noticed that the assignment form here, for example, of the deed of trust is in one regard, inaccurate. It says that MERS assigned the deed of trust, etcetera, etcetera. It also says, "and including any interest in the promissory note, and da dada dada da," underneath that. Okay. MERS doesn't have an interest in the promissory note. It doesn't claim an interest in the promissory note. It does not buy the promissory note, does not own the promissory note, never has, never will. The only time in which MERS takes an interest in a promissory note is in some jurisdictions, and I don't believe this is one of them, where as a precursor to commencing a foreclosure proceeding, you need to be the holder of the note before the mortgage commences. In that instance, the note makes its way back and becomes—and MERS becomes the custodian of that note, and becomes the holder of the note under the UCC. That is the only time. The language that is in the assignment of deed, is that language Pilar, in this case about the note is frankly—it's wrong. It doesn't follow the form that MERS requires that it be done in and it is—it is at most a conveyance of something it doesn't have. It doesn't have an interest— you know, this is the assignment, which was recorded document number 2009038049, and what it says is, "for value received hereby grants and assigns HSB as the trustee all beneficial interest and that certain deed of trust." And it gives the legal description, then it goes on to say, "together with note or notes, therein described or referred to the money due and become due thereon with interest and all rights accrued or to accrue under said deed of trust." That last language is frankly surplusage. It doesn't do anything. You can't convey what you don't have. We don't have an interest in there. I think it's—it's—it's probably I think it's bad drafting, or overcautious drafting of people saying well there may be monies owing under the deed of trust because when you foreclose, you're entitled attorneys' fees under the deed of trust, etcetera, at least in the form I would have used. But in any event, we don't own the note. That's not how the notes are transferred, not that I'll get into the notes in just a minute. So I think from that standpoint, you know, I think there's

10

EXHIBIT _10_

PAGE _10_

really, thanks Pilar; I think it's really quite clear. We're a beneficiary. MERS is a beneficiary. We're authorized to be beneficiary. There's no—there's no conditions, there's no limitations on being the beneficiary. The documents that we executed as beneficiary are within the specific powers granted both contractually by the borrower and statutorily by the Deed of Trust Act to a beneficiary. All we did is do what any other beneficiary would do in that instance. We assign the loan to the ultimate investor.

Now, let me try to address the REMA [unintelligible – 10:37:06] federal tax—deed of—securitization issue, because this gets thrown at me all of the time. And, I think it represents a fundamental misconception of how transactions are structured and what the assets are that are going into securitizations, okay. The only asset that goes into any type of securitization agreement is a negotiable instrument. It's a promiser. It's a promise to pay. And all securitizations do is find a way to take a pool of intangible assets which are governed almost exclusively by Articles Three and Nine of the UCC. They take those assets and they—they securitize them, and they sell undivided interest to, you know, eight million people all over the world. Those assets are held typically in a numbered trust—in this Deutsche Bank Trust has a long name—in a bankruptcy-proof numbered trust that they hold. And he's right, they have very specific rules about, you know, what you do and what you don't do. It's nothing to do with the recording of the mortgage. And this assignment is not how, the one I just read from, that's not how that asset got into any trust or in any subsequent sale. The way that you transfer intangible assets called promissory notes is really very straight forward. They're negotiable instruments, they can be delivered with a specific endorsement from Bank A endorsed to Bank B and then delivered, or they can be endorsed in blank and delivered. And if they are endorsed in blank, they become bearer paper. Bearer paper can be negotiated by simple delivery. If this is a bearer note, and I give it to Miss Pilar, she's the holder of that note. It is also possible and has been recognized by courts and—and legislatures for my entire career, which is going 35 years as a mortgage banking lawyer, that people can hold promissory notes in capacities, in fiduciary capacities, in a deed of trust—a trustee is a fiduciary. In MERS' capacity as a beneficiary for the lender it successes and assigns, it too is a fiduciary. It is a fiduciary agent of the lender it successes and assigns. It's fully disclosed, by the way, in the in—in the note. When you negotiate the paper, if you will, and most are aren't assigned, they're negotiated or transferred, that's just how they work. When that is done, it is—I hate to use this word—but it's true—it is axiomatic—that the debt follows—I mean, that the security follows the debt. What does that really mean? What that means is that the entity that owns—that ultimately owns that underlying note, that security is for their benefit. And anybody who acts in jeopardy of that is at risk. Plain [unintelligible – 10:40:41] a cite to case law about splitting of the note

11

EXHIBIT $1D$

PAGE $11$

and what-not, there's no splitting of the note here. You have a note that's secured by a deed of trust, which instead of being a—only having three parties involved in it, as was historically the case, is now a four-party deed of trust. In a mortgage, it becomes a three-party—mortgage state becomes a three-party agreement. There is no separation. At all times, MERS serves as the mortgagee or—I'm sorry, from a mortgage state as the beneficiary for the lender it successes and assigns. As interest in that note or transfer, and it should be noted, Your Honor, that promissory notes, you don't have to sell the whole interest. They may sell part of the interest to multiple parties. That happens a lot in securitizations. People will take pieces of it, but at all times, MERS remains the beneficiary for the benefit of those ultimate parties. The Oregon legislature does not require that transfers in that note be recorded in the county records at all. In fact, those transfers aren't recordable. They're not conveyances. The negotiations of intangible assets under Articles Three and Nine of the UCC. And I think that's true, again, in all of the 50 states. That's something that—that is—that is commonly done.

On the MERS issue, I didn't go through the entire deed of trust—the entire exhibit 10 that plaintiff's counted from—quoted from, but I did actually look at [unintelligible – 10:42:24] I looked at one section, where actually the MERS issue is—it is very specifically dealt with. And in—in the exhibit that plaintiff's counsel provides—and this is exhibit 10, page 155 of 184, and what it is, it's actually the mortgage loan purchase agreement between the depositor and the sponsor. And I would, yikes it's really small print, in section 4(b), [unintelligible – 10:43:07] b4, it is—it is a provision that deals with the delivery of the mortgage documents. And what it requires, it says, "the original mortgage including all riders [unintelligible – 10:43:22] with evidence recording thereon and the original recorded power of attorney. If the mortgage is executed for certain power of attorney in the deed, such and such" In the case of what is called a "MOM loan," and for the Court's clarification, in the industry a MOM loan is what this deed of trust is. It is a mortgage with MERS as the original mortgagee, or in this case, the original beneficiary. And what the parties to this transaction state is that what they require there is to note the presence of the mortgage identification number of the mortgage loan and either language indicated the mortgage loan is a MOM loan or if the mortgage loan was not a MOM loan in origination, the original mortgage and the assignment [unintelligible - 10:44:10] up to MERS with evidence of recording indicated thereon, you know, it's—it's tendered. There's no requirement that a separate assignment of mortgages be done in the instance when MERS is the mortgagee or beneficiary of the record. There's a very specific reason for that, Your Honor, because there's no change in mortgagee. They remain the mortgagee—or I'm sorry, I keep using the word mortgagee—the beneficiary, which actually Oregon statutes treat as a mortgagee, so I guess I can say mortgagee. There's—there's no change. There's—

12

EXHIBIT  10
PAGE  12

there's nothing—there's nothing to put the world on notice about. MERS was the mortgagee on day one, on day two, on day twenty. They were mortgagee up until such time as they transferred by assignment, which was duly recorded, that interest to HSBC, and it's—in its representative capacity as the trustee. So it is—it is very clear, I think, that the records properly reflect the transfers that need to be done. I don't think there's any need whatsoever to record transfers of interest in promissory notes. I don't think the Oregon statutes require it. I don't think that case law requires it. I think that the purchase and sale agreements—frankly I think they're distractions. Who cares what the tax code says? The plaintiffs are not parties to the PSA. They're not—they're not beneficiaries of the terms thereof. Who the ultimate owner of the debt is, is frankly irrelevant. The plaintiffs are—are obliged to make payments to the servicer of the loan that is the party that is the collection agent, they know who it is they've been trying to work out a loan modification with that person. It is the only person actually that has employees that deal with things like collecting payments, making sure your escrows are paid, and what not.

And that I think—well the last point, I think also instructive—the Oregon deed of trust does not [unintelligible at 10:46:28] statute, does not have a show me the note requirement like some states do. There is no requirement that you present the note. There is no requirement that you establish specifically of record beyond what's already of record, the capacity in which you are—you are acting or proving you are the rightful party [unintelligible – 10:46:52] this was supposed to be a quick, efficient remedy for a doc—a freely entered into contractual document that the parties agreed to, entered into knowingly, that gives specific statutory rights. We're not required to prove that we hold the note. We're not required to present the note. It is sufficient that the record parties are the ones bringing the action. I think the assumption of the legislature in all of these instances, is that the plaintiffs know who they are dealing with. They are the people who they are making payments to. They know who those people are and I think it's disingenuous to say they don't.

And I think at this point I've covered the MERS issue. I think I'll let Ms. Pilar French speak to some of the other issues that came up. Thank you Your Honor.

| | |
|---|---|
| JUDGE: | You bet. |
| MS. FRENCH: | Good morning Your Honor, I am counsel of record for MERS, but—but Mr. Pratte became involved in the case and I decided to let him handle the MERS issue. I am also representing HSBC as the trustee for the trust in which the loan sits, as well as the servicer and in this case is Wells Fargo Bank—not named as a party. But in terms of granting preliminary injunction, it's—the few remarks I would like to make in addition to Mr. Pratte's are that it is the plaintiff's burden to show that the injunction is |

13

EXHIBIT ___10___

PAGE ___13___

warranted by clear and convincing evidence. And so I just want to note to the court whose burden it is here—there's been a foreclosure proceeding started, there's been a declaration of default, and the plaintiffs have filed a complaint saying, "we're not in default, and we need an injunction." Indeed they got a—a temporary injunction, which was set over until today for proper hearing on preliminary injunction. As I understand it, there's also an order in the file that they're supposed to be making monthly payments of $3,500 since—since the—the temporary injunction was instituted. I wanted to check this morning with the cashier, and I'm not—I'm not sure if perhaps plaintiff's counsel can advise whether that payment has been made every month since the injunction was lodged. But, in any event, that no injunction should be granted unless there is sufficient bond issued that would cover the damages and attorneys' fees that the defendants would experience by being wrongfully enjoined. And so, if those payments haven't been being made, and I'm not—I'm not representing that they have, I don't know, but we—I'm sure we could clear it up here. The injunction should be dissolved immediately.

With regard to the default, if a declared entered default—that they're in default and have been duly notified under the terms of the deed of trust that they're in default and in fact, the notice of default which was attached to—is attached to the plaintiff's complaint at exhibit eight shows that the plaintiff has been in default since May 16, of 2009, so we are almost approaching two years for—for a default. There have been some allegations that the borrower's not really in default, but in support of the preliminary injunction, the plaintiffs attached an affidavit, I believe of Ms. Yovko's daughter wherein at page five, she admits that her mother is in default. She just simply says—excuse me, paragraph five, she admits that her mother is in default but argues that she doesn't believe it's a material default. Whether it's material or not is not the question. The question is whether is she is in default as that term is defined under the deed of trust, and she is in default. She actually hasn't made any payments since May of 2009, and by this time, Your Honor, she's grossly in default on the—on the mortgage.

The other—the other issue I have—I'm not ever sure that the affidavit of the daughter is sufficient evidence to her [unintelligible - 10:52:00] to prove up their case. The daughter is not a party to loan. Ms. Yovko is—is the borrower on the loan. Ms. Yovko is who the servicer of —from my review of the servicing notes, dealt with in this case. We've got letters from Ms. Yovko about her—about her default and why she went into default. It had to do with a loss of income due to the decline in the market. Not—it didn't have any—there's nothing—there's no records that show that this is a dispute about the accounting of the loan or what's being paid or who's responsible for what. It's just simply, I can't make my mortgage payments because I've lost some income, and I can no

14

EXHIBIT _10_
PAGE _14_

longer make these payments. And those letters are from Ms. Yovko, so I'm not sure that the daughter has personal knowledge to be testifying here or why Ms. Yovko is not testifying herself to prove her burden of proof in this case. But as it stands now, based on what the Court has, you don't have sufficient evidence presented by the plaintiffs that establish that this borrower's not in default, which is the first thing that they must overcome to justify stopping this foreclosure. They're in default under the contract; the bank is entire—entitled to foreclose, and then we get to the second issue is—is can MERS be the proper beneficiary for the reasons that Mr. Pratte explained, they can be the beneficiary, they are the beneficiary, because she agreed to it, so there shouldn't be an injunction here.

We I—I would reserve any further comments. I understood they were going try to present the witness or present evidence to the Court. I, you know, I'll take my issues up on cross-examination if the Court decides that the daughter is—does have sufficient personal knowledge to—to testify here about this case.

| | |
|---|---|
| JUDGE: | All right. Thank you. You're going to be calling witnesses? |
| MR. BOWLES: | Yes, Your Honor. |
| JUDGE: | All right. Well I'm going to take about a five minute break, and we'll go from there. |
| MR. BOWLES: | Thank you. |
| JUDGE: | You may call your witness. |
| MR. BOWLES: | Judge, may I respond to the [stops speaking] |
| JUDGE: | Call your witness. |
| MR. BOWLES: | Okay. Ms. Yovko. |
| BAILIFF: | Step up here to the witness box please. Raise your right hand. Under penalty of perjury, do you solemnly swear or affirm that the testimony you are about to give in this case shall be the truth, the whole truth, and nothing but the truth? |
| MS. SHAVLOVSKIY: | Yes. |
| BAILIFF: | Please be seated. For the record, please state your name, spell both your first and last please. |
| MS. SHAVLOVSKIY: | Victoria Shavlovskiy. Which is spelled V-I-C-T-O-R-I-A. Last name is S-H-A-V-L-O-V-S-K-I-Y. |
| BAILIFF: | Thank you. |
| JUDGE: | You may inquire. |
| MR. BOWLES: | Thank you. Where is your address? |
| MS. SHAVLOVSKIY: | 17427 SW Rivendell Drive, Durham, Oregon 97224. |

15

EXHIBIT ___10___
PAGE ___15___

| | |
|---|---|
| MR. BOWLES: | And who do you live with? |
| MS. SHAVLOVSKIY: | With my mom. |
| MR. BOWLES: | Okay. Is that the address of the property in question? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. How long have you lived there? |
| MS. SHAVLOVSKIY: | I first moved there for two and a half years. |
| MR. BOWLES: | Okay. Who has been the party that's been dealing with the loan—the bank? |
| MS. SHAVLOVSKIY: | American Servicing Company. |
| MR. BOWLES: | But who is the party between your mother and yourself? |
| MS. SHAVLOVSKIY: | Oh, oh I—I'm her daughter I was dealing with the process with the bank. |
| MR. BOWLES: | Okay. And why is that? |
| MS. SHAVLOVSKIY: | Well my mom has a language barrier and I help her deal with it. |
| MR. BOWLES: | Are you familiar with the payment history on the home? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. And did you prepare a list of the payments? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. And there were a series of defaults that were notices that were issued by the servicer is that correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. And what is your position on those amounts that are alleged in that notice—in those notices? |
| MS. SHAVLOVSKIY: | They're inaccurate. |
| MS. FRENCH: | Your Honor, I need to object for a couple of reasons. First, I haven't seen this... |
| MR. BOWLES: | Oh, that's—I'm sorry, I'm sorry. |
| MS. FRENCH: | ...and second, again, she is not a party to the transaction. I don't understand how she has personal knowledge to testify about... |
| JUDGE: | I agree... |
| MS. FRENCH: | ...this loan. |
| JUDGE: | ...you should have an opportunity to look at the document. As far as your objection as to she's laid a foundation that she has personal knowledge in that area and she has right to testify to that personal knowledge. |

16

EXHIBIT _10_

PAGE _16_

| | |
|---|---|
| MR. BOWLES: | Okay, this document is marked exhibit 11 on one. Is that a document that you created? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. Is that to reflect the payments that have been made on your home loan? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Object. I object to that question. It's not her home loan. |
| MR. BOWLES: | On your mother's loan? |
| JUDGE: | It's the same. |
| MS. SHAVLOVSKIY: | Yes. Yes on my mother's loan. |
| MR. BOWLES: | Okay. Do you oversee the payments on the loan? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. Do you write the checks on that loan? |
| MS. SHAVLOVSKIY: | My mom writes the checks after I look at the bill and tell her, you know, to—since its her account, she signs it and—but I do oversee how much is paid. |
| MR. BOWLES: | Do you recognize this document? |
| MS. SHAVLOVSKIY: | Yes, I do. |
| MR. BOWLES: | What is it? |
| MS. SHAVLOVSKIY: | It's a notice—part of notice of default we received from the bank. |
| JUDGE: | Has that been marked as an exhibit? |
| MR. BOWLES: | Not yet, Your Honor. |
| JUDGE: | Let's get it marked so we have an idea for our record purposes what we're talking about. |
| MR. BOWLES: | Yes, Your Honor. That would be exhibit 13, I believe. |
| JUDGE: | Okay. Thank you. |
| MR. BOWLES: | What's the date of that notice? |
| MS. SHAVLOVSKIY: | May 1, 2009. |
| MR. BOWLES: | And what is the amount that they allege you're behind on? |
| MS. SHAVLOVSKIY: | $12,492. |
| MR. BOWLES: | Okay and do you agree with the sum that they are alleging you're behind… |
| MS. SHAVLOVSKIY: | No. |
| MR. BOWLES: | …that your—that your mother's behind on in that notice? |

707220.0032/5074280.1

EXHIBIT 10
PAGE 17

| | |
|---|---|
| MS. SHAVLOVSKIY: | No. |
| MR. BOWLES: | Okay. Did these notices and that default notice—did it prompt you to doing investigation at all? |
| MS. SHAVLOVSKIY: | Yes, I decided to look into it. Yes. |
| MR. BOWLES: | Okay and what did that entail? |
| MS. SHAVLOVSKIY: | Well, I found a list of securities for the bank, I believe CTS Link, and I found in their collateral files certain trust. |
| MR. BOWLES: | Okay. |
| MS. SHAVLOVSKIY: | And I was able to identify the loan amount, the amount of first payment, the interest, and City of Durham, my mom's zip code, and so I was able to identify the loan number they used in their records. And then I went into their internal document file too. |
| MR. BOWLES: | Now in looking at your loan, was your loan principal and interest or was it just interest? |
| MS. SHAVLOVSKIY: | It was an interest only. |
| MR. BOWLES: | Okay. What are the [stops speaking] |
| JUDGE: | Mr. Bowles, just make sure it's clear, because you've said it multiple times. It's not her loan. |
| MR. BOWLES: | Her mother's loan. I'm sorry, Your Honor. On your mother's loan, what was the interest rate for the loan? |
| MS. SHAVLOVSKIY: | 5.875. |
| MR. BOWLES: | Okay. When you did the research, did you come up with a document, do you recognize that document? |
| MS. SHAVLOVSKIY: | Yes, yes. |
| MR. BOWLES: | What is that document? |
| MS. SHAVLOVSKIY: | This is a securitized loan information from the CTS Link web site. |
| MR. BOWLES: | Okay. And what is the date of that document? |
| MS. SHAVLOVSKIY: | The date is May 26, 2009. |
| MR. BOWLES: | And you were able to identify your loan. Can you please reference the amount that they are alleging that were behind on? |
| MS. SHAVLOVSKIY: | They alleged that we were behind $7,645. |
| MR. PRATTE: | I'm going—I object to that, Your Honor. That's not a statement of what is behind. That is a securitization statement of delinquent [unintelligible – 11:09:16] |
| JUDGE: | You'll be able to cross-examine. |
| MR. PRATTE: | Okay, thank you. |

18

EXHIBIT   /7

PAGE   18

| | |
|---|---|
| MR. BOWLES: | And in the far right-hand corner or far right-hand column does that state the amount of interest at all? |
| MS. SHAVLOVSKIY: | This is delinquent interest. |
| MR. BOWLES: | Okay. And so, if your loan was behind, how many months here? |
| MS. SHAVLOVSKIY: | Three months. |
| MR. BOWLES: | Okay. Three months. And they're saying you're behind seven thousand... |
| MS. SHAVLOVSKIY: | $645. |
| MR. BOWLES: | ...and five cents. Okay. How much does the default notice say for the [stops speaking] |
| MS. SHAVLOVSKIY: | $12,492. |
| MR. BOWLES: | Okay. And that figure right there represents the interest? |
| MS. SHAVLOVSKIY: | Interest only. |
| MR. BOWLES: | Okay. And your loan was? |
| MS. SHAVLOVSKIY: | Interest only. |
| MR. BOWLES: | Okay. Can we mark that as exhibit—exhibit 14? |
| JUDGE: | Any objection to the Court receiving 13, I take it you're offering these, since you handed them to me? All right. Any objection? |
| MS. FRENCH: | We will—we'll just reserve for cross-examination Your Honor. |
| JUDGE: | All right. So they're received for purposes of our hearing. |
| MR. BOWLES: | Did you subsequently receive any other default notices? |
| MS. SHAVLOVSKIY: | Yes, we did. |
| MR. BOWLES: | Your mother received subsequent default notices. |
| MS. SHAVLOVSKIY: | Yes, I understood the question. Yes. |
| MR. BOWLES: | Okay. And do you recognize that document? |
| MS. SHAVLOVSKIY: | Yes, I do. |
| MR. BOWLES: | And what is the date of that document? |
| MS. SHAVLOVSKIY: | January 25, 2010. |
| MR. BOWLES: | And how much is that notice—default notice stating your mother owes? |
| MS. SHAVLOVSKIY: | $22,998. |
| MR. BOWLES: | Did you research the payment history for that amount on that period as well? |
| MS. SHAVLOVSKIY: | Yes, I did. |
| MR. BOWLES: | Does that document look familiar? |

19

EXHIBIT   10
PAGE   19

| | |
|---|---|
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Let the record reflect I'm referring to plaintiff's exhibit 16. And what is the date of that document? |
| MS. SHAVLOVSKIY: | January 25, 2010. |
| MR. BOWLES: | And what is the date of the second notice here from the trustee? |
| MS. SHAVLOVSKIY: | January 25, 2010. Same day. |
| MR. BOWLES: | And how much does the—the loan schedule show that you were behind? |
| MS. SHAVLOVSKIY: | $13,761. |
| MR. BOWLES: | Okay and how much does the default notice again? |
| MS. SHAVLOVSKIY: | $22,998. |
| MR. BOWLES: | Okay. |
| MS. FRENCH: | May I—may I see—see those? |
| MR. BOWLES: | [unintelligible - 11:13:04]. |
| MS. FRENCH: | I don't think I got to see exhibit 16. |
| JUDGE: | Any objection to 15 and 16? |
| MS. FRENCH: | Nope, no objection. |
| JUDGE: | They're received. |
| MR. BOWLES: | This is a payment schedule for payments on the right-hand side. Our office. |
| MR. PRATTE: | Oh okay. |
| MR. BOWLES: | Do you recognize that document? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | And that is plaintiff's exhibit 11. On this document, there are a series of numbers correct? |
| MS. SHAVLOVSKIY: | Mmmm hmmm. |
| MR. BOWLES: | Okay. Columns? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. And can you please explain what the right-hand column is reflecting? |
| MS. SHAVLOVSKIY: | Right-hand column reflecting actual payments. |
| MR. BOWLES: | I'm sorry, could you repeat that? |
| MS. SHAVLOVSKIY: | Actual payments. |
| MR. BOWLES: | Okay, the actual payments. |

707220.0032/5074280.1

EXHIBIT __10__
PAGE __20__

| | |
|---|---|
| MS. SHAVLOVSKIY: | Payments made. |
| MR. BOWLES: | Okay, and then on the far left-hand column we have a date/timeline correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. This is a interest-only loan that had an ARM adjustment correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay, and when did the ARM adjust? |
| MS. SHAVLOVSKIY: | September 1, 2010. |
| MR. BOWLES: | Okay, on the second to the left-hand side column, what does that represent right here? |
| MS. SHAVLOVSKIY: | That represents payment schedule for interest only payment on the loan. |
| MR. BOWLES: | Okay, and then the smaller numbers down there what is that? |
| MS. SHAVLOVSKIY: | It's the payment after the adjustment. |
| MR. BOWLES: | Okay. What do these two middle columns represent? |
| MS. SHAVLOVSKIY: | These are property taxes and insurances—insurance payments. |
| MR. BOWLES: | Okay. Now, looking at the amounts that were paid in here, there is a running total correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | And is that reflected on the far-right hand side? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. And for the payment schedules for both the property taxes and the loan amounts, that is represented down here on the left-hand side correct? |
| MS. SHAVLOVSKIY: | Yes, that's correct. |
| MR. BOWLES: | Okay. And based on the payments that were made that say ended on December of 2008, 2008, there's a gap that occurred correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. Can you please explain that gap? |
| MS. SHAVLOVSKIY: | It turns out that property taxes that we thought were paid when we first purchased the house were not paid, and so we received a letter of escrow deficiency, and which raised our payments significantly about $365 a month. And it was total surprise for us because we, you know, didn't know there were any outstanding property taxes. So I called the bank and they just said, "nope, weren't paid." |
| | I called the title company and had them check how come, you know, we had delinquent taxes, because I thought they were supposed to check if |

21

EXHIBIT __10__
PAGE __21__

| | |
|---|---|
| | there's back taxes and collect from previous owners, and they told me that everything was collected properly and assigned properly and the taxes were collected appropriately and disbursed into appropriate escrow account. But, they were never paid. |
| MR. BOWLES: | Okay, and who held that money? |
| MS. SHAVLOVSKIY: | They said the original lender, Sierra Pacific Mortgage received the money and to talk to them. |
| MR. BOWLES: | So when was that first year of taxes eventually paid? |
| MS. SHAVLOVSKIY: | Those taxes were paid in 2008. With penalties and everything, it amounted to much more than the originally it was scheduled. |
| MR. BOWLES: | Okay, and was any adjustment ever made on the account? |
| MS. SHAVLOVSKIY: | No, no adjustments. They—I—I tried to resolve this, but it didn't go anywhere. Nobody—because when I called the bank, you just get the operator, and I mean, they can't tell you anything. |
| MR. BOWLES: | Was that part of the charges to the amount the bank said you owed? That your mother owes, excuse me. |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. And if you—if you look at the payment schedule of your actual payments, there are three final payments. |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | What were those three final payments for? |
| MS. SHAVLOVSKIY: | Okay, when I was going nowhere with taxes and our payment was still, you know, high because of the escrow deficiency, in order to avoid foreclosure, I negotiated with the bank to resume—to try to work on getting back into current payments, so they told me to pay $5,000 initially, and then every—well for two months after at $3,000 each. So they told me I need to pay initial payment of $5,000, and then $3,000 for the next two months in order for them to modify my loan. |
| MR. BOWLES: | And did modification come? |
| MS. SHAVLOVSKIY: | No. No, it never came, and I called them after we paid the last payment of $3,000, and asked them, what about, you know, when are you going to modify our loan? And they said, "well, you—you have to keep on paying $3,000 while we're working on that," and, you know, it's—it's been already $1,000 more than scheduled payment with insurance and escrow. So, we were not, you know, able to afford it because it was just so much more, and I didn't feel that bank was honest in working with me because three months has passed and nothing was going on. |
| MR. BOWLES: | Can you look at the total sum of payments that you had made from the start of the loan to the last payment? |

707220.0032/5074280.1

EXHIBIT _10_

PAGE _22_

| | |
|---|---|
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | And, how much was that? |
| MS. SHAVLOVSKIY: | $95,336. |
| MR. BOWLES: | Okay. Can you please look at the running column for the payments to the end of the period of—of—from the start of the loan to January 11th what is the total down here for your interest payment? |
| MS. SHAVLOVSKIY: | $86,010. |
| MR. BOWLES: | Okay. And then the total with the taxes and so forth? |
| MS. SHAVLOVSKIY: | $92,116. |
| MR. BOWLES: | Okay, and the—what is the total sum, which sum is actually greater? |
| MS. SHAVLOVSKIY: | The one that I made actual payments. |
| MR. BOWLES: | Okay. |
| MS. SHAVLOVSKIY: | That the greater sum. |
| MR. BOWLES: | Your actual payments... |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | ...your mother's actual payments. Okay, we'd like to submit that Judge, in the—exhibit 11. |
| JUDGE: | Any objection to 11, 16, and oh, 15 and 16 are done. So it's to 11? |
| MS. FRENCH: | No, Your Honor. |
| JUDGE: | It's received. |
| MR. BOWLES: | Can you please explain the circumstances that surrounded the need to file the bankruptcy? What happened? |
| MS. SHAVLOVSKIY: | Well, we got a default notice again, and the auction date was scheduled, and I called the bank, and they agreed to accept papers for a loan modification. So, we were in the process of the loan modification, and the bank postponed two auction dates because they were working on that loan modification, and so the last rescheduled date was October 16, of 2010, and they were still process of modifying the loan. But when I called them to see if they're going to postpone the auction, they said they would and because it was still in process. It was listed in [stops speaking] |
| MR. BOWLES: | What date did you call them? |

707220.0032/5074280.1

EXHIBIT   10
PAGE   23

| | |
|---|---|
| MS. SHAVLOVSKIY: | I started calling them at the end of—or I would say middle of September about 20 days prior to auction date. Before that, I was working with loan modification specialist, and we exchanged documents via Fed Ex in envelopes that they provided so they—they had all the documents that they requested, but they were still working, you know, finalizing the modification. And so the date was coming closer and they would not postpone it, so, you know, I called them many times. |
| MR. BOWLES: | When you say "they would not postpone it" who? |
| MS. SHAVLOVSKIY: | American Servicing Company. |
| MR. BOWLES: | Okay. |
| MS. SHAVLOVSKIY: | They said they contacted the investor with requests to postpone because the loan was in the process of modification and they said they are positive that the investor would agree. I had no idea who investor was or how system works. So, I trusted them. And so we came to the day of the auction and I'm on the phone with them and they are promising me to postpone the auction and the operator actually tells me that she sees it's in the process. I mean no new documentation was required. Nothing. And she's like I'm positive that it's going to be postponed. |
| MR. BOWLES: | Was it postponed? |
| MS. SHAVLOVSKIY: | No, no. I, you know, we walked into bankruptcy court 10 minutes literally before the auction time and we had to file bankruptcy because, you know, we just couldn't lose our house. |
| MR. BOWLES: | In the—in the period in which you were speaking with the bank about the arrearages, were you relying on the bank in anyway about a loan modification? |
| MS. SHAVLOVSKIY: | I absolutely had 100 percent positive impression that they are going to modify loan and take care of the back taxes and, you know, answer all the questions about, you know, payments and how they were allocated. So, I was hoping that, you know, they are going to modify loan and take care of—of all these issues that we've had. And they just kept telling me it's going to be postponed. They were basically tricking me. They were—they were not truthful with me. |
| MR. BOWLES: | Okay. Nothing further judge. |
| JUDGE: | Who is going to be doing the questioning? Ms. French? Go ahead. |
| MS. FRENCH: | Can you pronounce your name for me? |
| MS. SHAVLOVSKIY: | Vicki. |
| MS. FRENCH: | Your—your last name. |
| MS. SHAVLOVSKIY: | Shavlovskiy. |
| MS. FRENCH: | Mrs. Shavlovskiy? |

24

EXHIBIT _10_
PAGE _24_

| | |
|---|---|
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Now where do you live? |
| MS. SHAVLOVSKIY: | I live at 17427 SW Rivendell Drive. |
| MS. FRENCH: | And how long have you lived there? |
| MS. SHAVLOVSKIY: | Two and a half years. |
| MS. FRENCH: | Where did you live before that? |
| MS. SHAVLOVSKIY: | I lived in Tualatin. |
| MS. FRENCH: | What was the address? |
| MS. SHAVLOVSKIY: | 21955 SW 70th Avenue, in Tualatin. |
| MS. FRENCH: | And when—we agree this loan is about five years old, six year old at this point? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Were you serving as the—the point of contact with the bank from the inception of the loan? |
| MS. SHAVLOVSKIY: | You mean if I signed the—if my mother signed the authorization? |
| MS. FRENCH: | Well, just for—yeah, for talking to the bank. Since—since 2005 have you been the person that's been talking to the bank? |
| MS. SHAVLOVSKIY: | Yes. My mom would authorize every time I called my mom would authorize them to speak with me... |
| MS. FRENCH: | Okay. |
| MS. SHAVLOVSKIY: | ...she was present. |
| MS. FRENCH: | Okay. But documentation concerning the loan like letters and stuff like that—that was sent directly to your mother. Is that correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | And for a period of time your mother actually wasn't living at the Rivendell property. Correct? |
| MS. SHAVLOVSKIY: | For some period of time. |
| MS. FRENCH: | She live at—was it Arkenstone? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Now, Arkenstone was actually—was actually a piece of property that she had owned before she—she purchased the Rivendell property? |
| MR. BOWLES: | I object, I don't understand the relevancy of it. |
| JUDGE: | The relevance to this? |
| MS. FRENCH: | Basically establishing that this is a rental property, Your Honor, it's not it's actually not her home. And I will [stops speaking] |

25

707220.0032/5074280.1707220.0032/5074280.1

EXHIBITEXHIBIT _10_

PAGE _25_

| | |
|---|---|
| JUDGE: | It is not relevant to our proceedings here today. Sustained. |
| MS. FRENCH: | Well, if—if the court will permit me to at least state my record, it—it is relevant in terms of establishing irreparable harm. Are we dealing with a rental property or are we actually dealing with the primary residency. |
| JUDGE: | Move on. I sustained the objection. Move on. |
| MS. FRENCH: | Okay. Now, do you agree with me that your mother had stopped making the loan payment on May 1, 2009? Is that correct? |
| MS. SHAVLOVSKIY: | No, it is not correct. |
| MS. FRENCH: | When did she—did she make the May payment? |
| MS. SHAVLOVSKIY: | No, we stopped paying. She stopped making payment in January of 2009 when we received escalated payment schedule with new escrow deficiency and that's when [stops speaking] |
| MS. FRENCH: | That's when she stopped making the monthly payment? |
| MS. SHAVLOVSKIY: | Yes, because the payments went up almost $400. |
| MS. FRENCH: | And did you at any time, or your mother, send something in writing to the bank claiming that there had been an error with escrow? |
| MS. SHAVLOVSKIY: | I call them. |
| MS. FRENCH: | But nobody ever sent a letter? |
| MS. SHAVLOVSKIY: | No, I have not. |
| MS. FRENCH: | Okay. Now did you prepare letters on behalf of your mother? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | And have her sign them? |
| MS. SHAVLOVSKIY: | She—we prepared them together. |
| MS. FRENCH: | Okay. But can she speak English? |
| MS. SHAVLOVSKIY: | Well, some. But definitely not—not enough to handle the bank. |
| MS. FRENCH: | Would she understand the letters that she was signing that you were preparing for her? |
| MS. SHAVLOVSKIY: | Yes, of course, I explain to her. |
| MS. FRENCH: | Okay. So—[counsel speaking among themselves – 11:29:41 – 11:30:40] |
| | May I approach the witness? |
| JUDGE: | You may. |
| MS. FRENCH: | Do you recognize that letter? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Well, what is that letter? |

707220.0032/5074280.1

EXHIBIT  10
PAGE  26

| | |
|---|---|
| MS. SHAVLOVSKIY: | It's a—in order to be considered for modification you have to write a hard—hardship letter. |
| MS. FRENCH: | Okay. And in this letter—that you prepared this letter? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | But your mother signed it? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | And you worked with your mother to establish the contents of it—of it? |
| MS. SHAVLOVSKIY: | Absolutely. |
| MS. FRENCH: | Okay. You see in the first paragraph there it says, "This letter is a request for consideration for a loan modification. I have found myself struggling with my mortgage payments since a reduction in my income." |
| MS. SHAVLOVSKIY: | Okay. |
| MS. FRENCH: | That's what it says. Correct? |
| MS. SHAVLOVSKIY: | Yes, it does. |
| MS. FRENCH: | It doesn't say anywhere in there that there's been an error concerning taxes or that the bank is charging the wrong amount for the monthly payment. Does it? |
| MS. SHAVLOVSKIY: | It does not. |
| MS. FRENCH: | It simply says can't make the payment because I suffered a reduction in income. Correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Okay. If we could admit that into evidence. |
| JUDGE: | What is it marked as? |
| MS. FRENCH: | As defense exhibit 1. |
| MR. PRATTE: | Respondents. |
| MS. FRENCH: | Respondent. |
| JUDGE: | Let's make it 101 and 102 because it's easier to keep track of everything. So we'll just—we'll mark that as 101. Any objection to 101 being received? |
| MR. BOWLES: | No Your Honor. |
| JUDGE: | It's received. |
| MS. FRENCH: | May I approach the witness? |
| JUDGE: | You may. |
| MS. FRENCH: | Can you identify what's been marked as Respondent's exhibit 102? |
| MS. SHAVLOVSKIY: | Yes, yes. |

27

EXHIBIT _10_

PAGE _27_

| | |
|---|---|
| MS. FRENCH: | Can you tell me what this is? |
| MS. SHAVLOVSKIY: | This is another hardship letter. |
| MS. FRENCH: | And this is a letter that you helped your mother prepare? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | And she signed it. Correct? |
| MS. SHAVLOVSKIY: | Yes. Yes. |
| MS. FRENCH: | And—but you yet worked with her to get—get information in the letter that concerned her financial circumstances. Right? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Okay. So the second paragraph says, "In the middle of 2008 business where I am working as a manager has lost some of its accounts clients which caused significant reduction in my income. This reduction in pay was quite a burden on my family. I have found myself struggling with my mortgage payment since a reduction in my income. I have maxed out my credit cards and even have reached to my family for help in order not to be late on my mortgage payments. However, in the beginning of 2009, my credit cards were maxed out and devastated, I found myself missing and not being able to pay my mortgage." |
| MS. SHAVLOVSKIY: | Uh-hmm. |
| MS. FRENCH: | I just want to make sure I understand. That's your mother's circumstances. Correct? |
| MS. SHAVLOVSKIY: | Of course. |
| MS. FRENCH: | Okay. |
| MS. SHAVLOVSKIY: | It's not my circumstance. It's my mother's circumstance. |
| MS. FRENCH: | Okay. But she was actually—before the beginning of 2009, she was actually already kind of struggling already due to the loss of income to make the mortgage payment isn't that correct? |
| MS. SHAVLOVSKIY: | It was more difficult, yes. |
| MS. FRENCH: | And she was maxing out her credit cards and doing some other things in order to compensate for the loss of income. Correct? |
| MS. SHAVLOVSKIY: | In order to make—well, stay current on her house payment. Yes. |
| MS. FRENCH: | Okay. Now, do you have anything in writing that says the bank agreed to give your mother a loan modification? |
| `MS. SHAVLOVSKIY: | Nothing in writing, but they were working on that. |
| MS. FRENCH: | Okay. So [stops speaking] |
| MS. SHAVLOVSKIY: | I mean, they postponed auction dates two times and they were in the process of doing it. |

28

EXHIBIT _10_

PAGE _28_

| | |
|---|---|
| MS. FRENCH: | Now, when I look at exhibit 102 that we've been looking at—the top sheet is the letter—the hardship—what you called the hardship letter correct? And underneath it is making home affordable program request for modification and affidavit. So, there is an application underneath. Correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | That you filled out. You agree with me that—that this is an application. |
| MS. SHAVLOVSKIY: | Uh-hmm. |
| MS. FRENCH: | Not an agreement that you will get the loan modification. |
| MS. SHAVLOVSKIY: | No, I understand. |
| MS. FRENCH: | Okay. |
| MS. SHAVLOVSKIY: | I was promised a loan modification and I was told that my mom was qualified for a loan modification. And I was told that the auction would be postponed until ten minutes—until the auction I had to, you know, my file—my mom had to file bankruptcy. So I was assured many times that we are qualified and they are going to go through with this. |
| MS. FRENCH: | And, now, let's—if—if we could look at—I think it was exhibit 11? Plaintiff's exhibit 11. Do you have a copy of that there? |
| MS. SHAVLOVSKIY: | No. |
| MS. FRENCH: | Now these—the three payments that you've—you've mentioned were made the $5,000, the $3,000, and the $3,000, those were made in August of 2009, September 2009, and it looks like October 2009? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | And if I—I just want to make sure I understand your testimony. What— what I understood was after those three payment were made, your mother stopped making any further payments because [stops speaking] |
| MS. SHAVLOVSKIY: | Because they said we have to make $3,000 payments, otherwise they will not work on any loan modification and with business being down, one cannot be expected to pay such an increase. |
| MS. FRENCH: | Okay. |
| MS. SHAVLOVSKIY: | And that's what—they—they didn't go lower, they didn't work any other payments, they just said if we stop making $3,000 payments, the deal is off. |
| MS. FRENCH: | Okay. So that was what the bank advised and your mother elected or could not continue to make $3,000 payments… |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | …after that. |
| MS. SHAVLOVSKIY: | Yes. |

707220.0032/5074280.1

EXHIBIT 10
PAGE 29

| | |
|---|---|
| MS. FRENCH: | And so the—that stopped in December 2009. No more payments. Correct? |
| MS. SHAVLOVSKIY: | Yes, that is correct. |
| MS. FRENCH: | Now, when—do—do you remember when you initially got the injunction put in place to stop—to stop the foreclosure? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | And, there was an order issued directing you to pay—make a bond payment? |
| MS. SHAVLOVSKIY: | You know, I'm—it—I'm not an expert in that area. I—I [stops speaking] |
| MS. FRENCH: | Oh, I'm sorry, ordering your mother to make a bond payment. |
| MS. SHAVLOVSKIY: | No, I understand what you are implying. Bond—I—I don't remember. |
| MS. FRENCH: | Okay. Don't—you don't remember anything about that? |
| MS. SHAVLOVSKIY: | No. |
| MS. FRENCH: | Do you know whether your mother has been making a monthly payment of $3,500 into the court since February 4, 2011, when the injunction was issued? |
| MS. SHAVLOVSKIY: | Oh, you—no—I—I misunderstood what you were asking. Yes, we were ordered to pay $3,500, which she did. |
| MS. FRENCH: | Okay, but no—not on a monthly basis? |
| MS. SHAVLOVSKIY: | It was one time—my understanding it was one time thing. |
| MS. FRENCH: | Your Honor, may I approach the witness? |
| JUDGE: | You may. |
| MS. FRENCH: | Have you ever seen this document before? |
| MS. SHAVLOVSKIY: | It was a different—it didn't say monthly. No. |
| MS. FRENCH: | Okay, but you agree with me that John Bowles is your attorney? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | And that his signature is on this document that's called plaintiff's posting of cash security under ORCP 82? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | And it looks there that what is says is "Pursuant to order of the court, plaintiff will tender the correct amount required under the five-year arm adjustment of her loan in the amount of $3,500" and it does say "monthly hereafter" in this document. Correct? |
| MS. SHAVLOVSKIY: | I think initially it was prepared 974, it was crossed out and I remember seeing a judge's order as you know, demanding one-time payment of |

707220.0032/5074280.1

EXHIBIT _10_

PAGE _3b_

$3,500.

MS. FRENCH: Okay, but this document here says monthly here ever—hereafter. Is that correct?

MS. SHAVLOVSKIY: It—it does but it—it has initial amount crossed out, so I am not sure where did that come from.

MS. FRENCH: Okay. Go ahead and mark this Respondent's exhibit 103. And I'm sorry, I don't have a copy of this, but it was submitted with what you gave me. I'm gonna propose for a [unintelligible – 11:42:05]

JUDGE: Any objection to 103?

MR. BOWLES: Other than if—if it matches the court's file judge that's fine.

MS. FRENCH: I don't have copies of the documents that your attorney previously discussed with you. Is it okay if I stand up there and...

MS. SHAVLOVSKIY: Yeah, that's fine.

MS. FRENCH: ...talk to you about them?

JUDGE: Ms. Johns may have the exhibits [unintelligible – 11:42:35] are received.

MS. FRENCH: We have some of them over here. These are the ones. Thanks.

Now, let's look at—now you tell me if—if I've got the corresponding—what I'm looking at is plaintiff's exhibit 13 and 14? And you talked about these before with your attorney? Now, do I—do I have right corresponding—you pulled this—this document called Deutche Alt A Securities, Inc. is this the correctly dated one that corresponds with—with this danger notice that's—that is marked as plaintiff's exhibit 13?

MS. SHAVLOVSKIY: Well exhibit 13 is dated May 1, 2009, and exhibit 9, I mean 14 dated May 2009.

MS. FRENCH: Okay. So, what you were looking at is—this is your mother's loan number here?

MS. SHAVLOVSKIY: This is a loan number that's the security—the securities was using.

MS. FRENCH: Okay. And it—it is highlighted in pink and it says, for the record, 0110839115? Is that correct?

MS. SHAVLOVSKIY: Yes.

MS. FRENCH: Okay. And, it has a column that says approximate delinquent interest.

MS. SHAVLOVSKIY: Yes.

MS. FRENCH: Is that correct?

MS. SHAVLOVSKIY: Yes.

MS. FRENCH: And your contention is I'm looking at plaintiff's exhibit 13 which says that the delinquency on the whole loan is $12,492.09, whereas this Alt A Securities document says approximately $7,600.

707220.0032/5074280.1

EXHIBIT 10
PAGE 31

| | |
|---|---|
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Do you agree with me that the Alt A Securities document doesn't address past due taxes or insurance that may be owing? |
| MS. SHAVLOVSKIY: | It's—it is my understanding that it reflects interest and since my loan is an interest only it should come very close. |
| MS. FRENCH: | Okay, but it doesn't talk about past due taxes that the bank has paid, or insurance correct? |
| MS. SHAVLOVSKIY: | No, it does not. |
| MS. FRENCH: | Okay. Whereas exhibit 13 doesn't say that the delinquency is just limited to interest does it? |
| MS. SHAVLOVSKIY: | It does not. |
| MS. FRENCH: | Okay. It gives you a total amount and that could include past due taxes. |
| MS. SHAVLOVSKIY: | It does not add up anyway. It does not add up. |
| MS. FRENCH: | Okay. But you agree with me that [stops speaking] |
| MS. SHAVLOVSKIY: | It's possible but it—the difference is so great it does not add up. |
| MS. FRENCH: | Okay. And we had the same issue with exhibits 15 and 16. |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | That exhibit 16, and again, Deutche Bank Alt A Securities, Inc. record simply identifies an approximation of delinquent interest. |
| MS. SHAVLOVSKIY: | Right and since my loan—my mom's loan was interest only loan it should come very close in numbers and since at that time the taxes were already paid, there was no delinquency. |
| MS. FRENCH: | Well, she—she was paying interest plus money for escrow for taxes … |
| MS. SHAVLOVSKIY: | That's right. |
| MS. FRENCH: | …and insurance… |
| MS. SHAVLOVSKIY: | That's right. |
| MS. FRENCH: | …on a monthly basis correct? |
| MS. SHAVLOVSKIY: | That's right. Yes. |
| MS. FRENCH: | Okay. |
| MS. SHAVLOVSKIY: | But there's a difference of $13,000 between those two documents. So it does not add up it—even if it says approximate value it should come close. |
| MS. FRENCH: | For the delinquent interest only. |
| MS. SHAVLOVSKIY: | Right. |
| MS. FRENCH: | Correct? |

707220.0032/5074280.1

EXHIBIT  10
PAGE  32

| | |
|---|---|
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Okay. Can you—can you look at exhibit 11 again? I ask you a question. |
| MS. SHAVLOVSKIY: | Okay. |
| MS. FRENCH: | This is the—like a spreadsheet that you prepared with your attorneys? |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | Or your mother's attorneys? And I am a little confused about the—there's a $92,116.58 number at the bottom on the left. |
| MS. SHAVLOVSKIY: | Yes. |
| MS. FRENCH: | I am a little confused about what that—what does that number represent? |
| MS. SHAVLOVSKIY: | Okay, that number represents total scheduled loan interest only payment. Plus property taxes paid plus insurance paid. |
| MS. FRENCH: | And how are you—if I—if I can approach the witness again … |
| JUDGE: | You may. |
| MS. FRENCH: | …Your Honor, I just—I'm not sure I am understanding what this means because I see in the center of the page here a property taxes of $20,000 approximately $19,000. |
| MS. SHAVLOVSKIY: | Right. |
| MS. FRENCH: | And when you add that to $86,000 which is in this—right here? |
| MS. SHAVLOVSKIY: | No, you should add it to $67,000. |
| MS. FRENCH: | Okay. Can you tell me what the $86,000 figure represents? |
| MS. SHAVLOVSKIY: | It's scheduled payment, principal—I mean interest only payment plus property taxes paid. |
| MS. FRENCH: | The $86,000? |
| MS. SHAVLOVSKIY: | Yes. Yes. And if you add another $6,000 for insurance payments you come up with $92,000. |
| MS. FRENCH: | Oh, that's how you're getting it. Okay. |
| MS. SHAVLOVSKIY: | Right. So we combined what was supposed to be paid on interest only pay—payment plus insurance and plus property taxes paid and $92,000 that's amount that should have been paid according to sched—you know, schedule. |
| MS. FRENCH: | Over what period of time? |
| MS. SHAVLOVSKIY: | Over from September 5—September of '05 until January 2011, for the whole life of the loan. |
| MR. PRATTE: | If I may Your Honor? |
| JUDGE: | If you may what? |

33

EXHIBIT 10

PAGE 33

| | |
|---|---|
| MR. PRATTE: | I ask a question? |
| JUDGE: | Any objection to Mr. Pratte asking a question? |
| MR. BOWLES: | Your Honor, I think there's sort of one person up to bat and that is Pilar. |
| JUDGE: | Is that an objection or not? |
| MR. BOWLES: | I object Your Honor. |
| JUDGE: | All right. Overruled. Go ahead. |
| MR. PRATTE: | I'm just—I'm going to try hard to pronounce your name, Ms. Shavlovskiy. |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Is that close? The question on that securitization document that you pulled off the web site, do you know what that document reflects in terms of who that interest is owed to and at what rate? |
| MS. SHAVLOVSKIY: | I assume that the—my understanding that this is what—what's owed in interest on the loan. |
| MR. PRATTE: | Owed to whom? Owed to the investors and the securitization? Or owed to the lender on the note? |
| MS. SHAVLOVSKIY: | I would assume it's—it's a report [stops speaking] |
| MR. BOWLES: | I object. Your Honor I think I called the [unintelligible – 11:51:10] |
| JUDGE: | Hold on—hold on. Hold on. Hold on. If you know the answer, if don't know the answer just say you don't know the answer. You don't know. |
| MS. SHAVLOVSKIY: | I don't know the answer. |
| MR. PRATTE: | Okay. Would it surprise you to learn that when mortgages are put into securities that the interest rate that is passed through to investors is different than the—the, excuse me, is different than the interest rate which is on the underlying promissory note? |
| MS. SHAVLOVSKIY: | No. |
| MR. PRATTE: | Would it surprise you to learn that that interest is lower by as much as one entire percentage point? |
| MS. SHAVLOVSKIY: | Okay. |
| MR. PRATTE: | Would it surprise you to learn that different fees come out of the interest payments that are made to investors and securitizations? |
| MS. SHAVLOVSKIY: | Perhaps. |
| MR. PRATTE: | Okay. You are aware that there is—that—that there is a company that services your loan to whom at one point you were making payments correct? |
| MS. SHAVLOVSKIY: | Yes. |

34

EXHIBIT __10__

PAGE __34__

| | |
|---|---|
| MR. PRATTE: | Do you assume they get paid for that service? |
| MS. SHAVLOVSKIY: | Yes, they have to. |
| MR. PRATTE: | And where do you suppose they get paid [unintelligible – 11:52:43] |
| MR. BOWLES: | [unintelligible – 11:52:44] speculation Judge |
| JUDGE: | He's asking her if she knows. If she has personal knowledge of that. |
| MS. SHAVLOVSKIY: | No. |
| MR. PRATTE: | Would it seem reasonable to you that they would get paid from the payments that are collected on the loan? |
| MS. SHAVLOVSKIY: | Probably. |
| MR. PRATTE: | As a percentage of the loan [unintelligible – 11:53:06] |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay. So it—is it reasonable then based on what we just talked about to think that perhaps that the number that is reflected in the securitization document report that covers a period of time may represent a completely different interest amount than your mother would owe on her note. |
| MS. SHAVLOVSKIY: | It seems unlikely to me because the difference is just so great. It doesn't seem right. |
| MR. PRATTE: | When you don't make—I keep saying you, I keep saying you, we're understanding... |
| MS. SHAVLOVSKIY: | No, I understand what you [unintelligible – 11:53:55] |
| MR. PRATTE: | ...that it's your mother we're talking about. When payments are not made on the mortgage amount that's owed as you can understand that late fees are charged? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay. Do you know what those late fees are approximately? |
| MS. SHAVLOVSKIY: | About $90. |
| MR. PRATTE: | $90. Okay. And so for two years you would have two years' worth of $90 late fees owed. |
| MS. SHAVLOVSKIY: | If—if I was late yes. |
| MR. PRATTE: | Okay. Have you been paying your own hazard insurance premiums? |
| MS. SHAVLOVSKIY: | Are you asking me or my mom? |
| MR. PRATTE: | I'm sorry. Has—have you or your mother been writing checks to a hazard insurance company yourself for your homeowner's insurance? |
| MS. SHAVLOVSKIY: | No, no the servicing company collected escrow money and paid. |
| MR. PRATTE: | And you have not made any real estate tax or escrow payments or |

35

EXHIBIT  10
PAGE  35

|  |  |
|---|---|
| | mortgage payments for two years correct? |
| MS. SHAVLOVSKIY: | It's not correct. Because we made payments of $11,000 in August, September, and October of '09. So it's not two years. |
| MR. PRATTE: | Okay. So [stops speaking] |
| MS. SHAVLOVSKIY: | And besides, you know, they collected tax money at escrow, I mean, at the signing of the loan documentation and they did not pay the taxes for that year, they paid taxes, property taxes in 2008 and passed all the penalties to us. So if you go back and you—you calculate how much we paid, I don't think the delinquent amount corresponds. |
| MR. PRATTE: | Okay. So it is your contention that they have passed on to you any late penalties any late—excuse me, I can't talk, any late payment penalties assessed by the county in which your home is … |
| MS. SHAVLOVSKIY: | They certainly did. |
| MR. PRATTE: | …located. Okay. Are there any outstanding taxes on your home now? |
| MS. SHAVLOVSKIY: | No. |
| MR. PRATTE: | So they have all been paid? |
| MS. SHAVLOVSKIY: | They have all been paid. |
| MR. PRATTE: | Do you know approximately how much the taxes are on your home? |
| MS. SHAVLOVSKIY: | Well, right now it's about $4,000. |
| MR. PRATTE: | And what were they in 2005? |
| MS. SHAVLOVSKIY: | About $3,300. |
| MR. PRATTE: | $3,300. So in the—in the five or six years it should have been about $15,000 worth of taxes paid? |
| MS. SHAVLOVSKIY: | Actually the number is $19,009.58. |
| MR. PRATTE: | That should have been paid? |
| MS. SHAVLOVSKIY: | That's been paid. |
| MR. PRATTE: | And they have—and they have been paid. |
| MS. SHAVLOVSKIY: | They have been paid. |
| MR. PRATTE: | Okay. Are you in a position to bring the loan current—you—your mother? |
| MS. SHAVLOVSKIY: | According to exhibit 11 the amount that was paid on the loan and the amount that should have been paid indicates that it's not even past due. |
| MR. PRATTE: | And that's an exhibit that you prepared? Or you and your attorneys prepared. Correct? |
| MS. SHAVLOVSKIY: | Yes, and I think it's correct. |

707220.0032/5074280.1

EXHIBIT    _10_

PAGE    _36_

| | |
|---|---|
| MR. PRATTE: | And have you received a statement from the mortgage servicer on what they received and what their records reflect? |
| MS. SHAVLOVSKIY: | I haven't received—we haven't received a statement for awhile, but I didn't think we are disputing any payments made. |
| | You know, I preparing for this I checked with the bank. I didn't just write down the numbers. I, you know, I went through bank statements and I found every single payment that's been made. And so, that's how this exhibit was prepared. |
| MR. PRATTE: | Now, at—at the interest rate on your loan of five and .875 percent, five years of interest only on that would be approximately $98,000 correct? |
| MS. SHAVLOVSKIY: | Five [stops speaking] |
| MR. BOWLES: | Judge? Unless there's some means by which she can calculate that I think that's asking her to speculate or assume his answer. |
| JUDGE: | She has put herself out as the person whose done all the accounting on … |
| MR. BOWLES: | All right. |
| JUDGE: | …this. It's a fair question. |
| MS. SHAVLOVSKIY: | I don't think you're correct in your calculations. I—according to my numbers if you include adjust—adjusted payment it's $67,000. |
| MR. PRATTE: | Okay let's—may I approach… |
| JUDGE: | You may. |
| MR. PRATTE: | …Your Honor? My handy dandy 12-C calculator. And I apologize I can't—I can't use a normal calculator, but your loan amount is $334,000… |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | …correct? Okay. If I enter $334,000, which—okay? And there—and it's 5.875, but five percent your interest rate right? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay, so 5.875 percent. That would give $19,622.50… |
| MS. SHAVLOVSKIY: | Well accordingly to… |
| MR. PRATTE: | …plus interest. |
| MS. SHAVLOVSKIY: | …closing loan documents my payment was $1,600—$1,635. According to loan documents. |
| MR. PRATTE: | You see that number is $19,622.50. |
| MS. SHAVLOVSKIY: | Well, according to loan documents my payment was… |
| MR. PRATTE: | Okay. |
| MS. SHAVLOVSKIY: | …$1,635. |

37

EXHIBIT D
PAGE 37

| | |
|---|---|
| MR. PRATTE: | That was a full year of interest okay? So, divide that by 12 and I get that number. |
| MS. SHAVLOVSKIY: | Okay. |
| MR. BOWLES: | Judge what is the number? I'm confused. |
| MR. PRATTE: | I'm sorry. I was—I will show you. She said her payments were $1,635.20. So, I'm going to multiply that times 12. $19,622.50 is the yearly interest… |
| MR. BOWLES: | Okay. |
| MR. PRATTE: | At that—at that interest rate. Correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay, now refresh my recollection if you would please. Did you tell me that the interest rate on your loan adjusted or tell the Court [stops speaking] |
| MS. SHAVLOVSKIY: | September 1, 2010. |
| MR. PRATTE: | 2010. And so you closed, when did this loan close for? June of 2005? |
| MS. SHAVLOVSKIY: | July 27. |
| MR. PRATTE: | Okay, July so we have '05, '06, '07—'06, '07, '08, '09, '10 so we basically had five full years of interest at the higher rate. Correct? |
| MS. SHAVLOVSKIY: | Okay. |
| MR. PRATTE: | Okay so $19,622.5 is the number we decided it was your interest only payments correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay so we multiply that times five and that number is ninety-eight thousand [stops speaking] |
| MS. SHAVLOVSKIY: | I—you know, I'm sorry can't go like that. I mean you're punching the numbers and I… |
| MR. PRATTE: | Okay. You want to do it on yours go ahead. |
| MS. SHAVLOVSKIY: | ….it's just. |
| MR. PRATTE: | You can do it on yours. |
| MS. SHAVLOVSKIY: | Well, I have itemized here. |
| MR. PRATTE: | I understand that. I and—and … |
| MS. SHAVLOVSKIY: | Right. |
| MR. PRATTE: | …this is a statement that you and your attorneys prepared… |
| MS. SHAVLOVSKIY: | Well it's [stops speaking] |
| MR. PRATTE: | I wasn't privy to how you prepared that okay? |

38

EXHIBIT    10
PAGE      38

| | |
|---|---|
| MS. SHAVLOVSKIY: | Okay. |
| MR. PRATTE: | What I'm trying to figure out now is how much interest was actually owed on your loan. Okay? And so, what we decided was your loan was for $334,000, we agree on that correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay. We agree that your interest rate, excuse me, is 5.875 percent. Correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay. We agreed, I believe, that 12 monthly payments of interest only would equal $19,622.50 right? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | That was your monthly payment times 12 okay? So now, all I'm suggesting is that before the interest rate was adjusted... |
| MS. SHAVLOVSKIY: | Okay. |
| MR. PRATTE: | Okay? That that's approximately five years. |
| MS. SHAVLOVSKIY: | Okay. |
| MR. PRATTE: | Correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | So if you multiply and if you would please do it on your calculator, multiply $19,622.50 times five, what number do you get? |
| MS. SHAVLOVSKIY: | Okay, I'm sorry can you—can we do it again? |
| MR. PRATTE: | Oh absolutely. It's math, I hate math. $19,622.50 times five. |
| MS. SHAVLOVSKIY: | $98,112. |
| MR. PRATTE: | Okay, so that would be the interest only that would be due... |
| MS. SHAVLOVSKIY: | Right. |
| MR. PRATTE: | ...over five years on your loan... |
| MS. SHAVLOVSKIY: | Right. |
| MR. PRATTE: | ...and that was—that got us in July of last year. Correct? |
| MS. SHAVLOVSKIY: | No, not July through September. |
| MR. PRATTE: | September? That's when the rate adjusted? Okay. |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay, so it's a little more than five years. So we're a little bit short there, but we'll assume that [stops speaking] |
| MS. SHAVLOVSKIY: | Well, the first payment was September of '05 so it's not more than five years. It's exactly five years. |

39

EXHIBIT _10_

PAGE _39_

| | |
|---|---|
| MR. PRATTE: | Okay, okay, so it's five years. So [unintelligible – 12:03:58] what interest rate did the loan change to? |
| MS. SHAVLOVSKIY: | Three and a half. |
| MR. PRATTE: | Three and a half. Nice rate. So, and we still owe $334,000 correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay, so we have $334,000 and what was your rate again? Three? |
| MS. SHAVLOVSKIY: | Three point five. |
| MR. PRATTE: | Three point—oh shoot, I messed up okay. Thousand enter three point five percent, that makes an interest payment of $11,690 a year, which I'll divide that by 12, your new monthly payment, and again, just interest should be approximately 9—excuse me, $974 and 17 or 16 cents. |
| MS. SHAVLOVSKIY: | Yes, I have it right here. |
| MR. PRATTE: | Okay? All right so, from let's see we have September, October, November, December, January, February, March, April, we had eight months of interest that are due at this lower interest rate correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | Okay, so if you multiply that times eight do you want to compare? |
| MS. SHAVLOVSKIY: | No go ahead. |
| MR. PRATTE: | I get $7,793.33. And so if I then add that amount the interest at the lower—will be a three percent rate to the $98,113, the interest only that should have been paid on your loan is $105,906.83. |
| MR. BOWLES: | Objection Judge that's not in the form of a question it's a statement he's testifying. |
| JUDGE: | Sustained. |
| MR. PRATTE: | Is my math correct? |
| MS. SHAVLOVSKIY: | It seems to be correct. |
| MR. PRATTE: | Okay. So in addition to that amount, which would be owed on the mortgage of just interest, you would also have to pay an appropriate amount for real estate taxes and insurance. Correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | So, it would be somewhere north of $106,000. You thought your taxes were how much a year? |
| MS. SHAVLOVSKIY: | $4,000. |
| MR. PRATTE: | $4,000. So five years of taxes [stops speaking] |
| MS. SHAVLOVSKIY: | Well—well no, it's $3,300 and raising about a couple hundred a year so [stops speaking] |

707220.0032/5074280.1

EXHIBIT  _10_
PAGE  _40_

| | |
|---|---|
| MR. PRATTE: | So what do you think—how much would your real estate taxes be approximately a total for five years or [unintelligible – 12:06:38] six years? |
| MS. SHAVLOVSKIY: | About $19,000. |
| MR. PRATTE: | $19,000. So if I added $19,000 to this number of $105, which I moved it right in front of here, I'm going to add $19,000 plus that gives about $125,000 correct? |
| MS. SHAVLOVSKIY: | Okay. |
| MR. PRATTE: | Okay. And then you have your home owner's insurance on top of that whatever that is. Okay. |
| MS. SHAVLOVSKIY: | Right. |
| MR. PRATTE: | So at this point, in theory, had you made all the payments that are required on this loan, again a collective you, your mother, you would owe a $125,000—you would have paid $125,000. |
| MR. BOWLES: | Question Judge? |
| MR. PRATTE: | [unintelligible – 12:07:13] |
| JUDGE: | He just did. |
| MR. PRATTE: | I'm going to ask her a question just now. If that's okay. So, how much did you pay according to your charts? |
| MS. SHAVLOVSKIY: | $95,336. |
| MR. PRATTE: | [unintelligible – 12:07:29] $95,000 |
| MS. SHAVLOVSKIY: | Three hundred thirty six. |
| MR. PRATTE: | Three hundred and thirty-six dollars. Okay that's what I'm going to do and I'm going to subtract it. So, according to my math your behind $29,570.83. |
| MS. SHAVLOVSKIY: | Okay. |
| MR. PRATTE: | Okay? Now do you have a problem with my calculation? |
| MS. SHAVLOVSKIY: | No, I don't have a problem with your calculation. But according to the papers that were sent from the bank dated January 25 of 2010, they allege that we owe $22,998, which is [stops speaking] |
| MR. PRATTE: | Which is less than this amount. |
| MS. SHAVLOVSKIY: | Well by [stops speaking] |
| MR. PRATTE: | $7,000? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. PRATTE: | So, accordingly… |
| MS. SHAVLOVSKIY: | And it's last year [stops speaking] |

41

EXHIBIT __10__
PAGE __41__

| | |
|---|---|
| MR. PRATTE: | ...to the math that we just did that's actually less than this [stops speaking] |
| MS. SHAVLOVSKIY: | But it's a—it's a last year figure. It's 12 months worth of payments so [stops speaking] |
| MR. PRATTE: | And does that include late fees? |
| MS. SHAVLOVSKIY: | It may include late fees. |
| MR. PRATTE: | Okay. |
| MS. SHAVLOVSKIY: | I'm not sure what it includes. |
| MR. PRATTE: | No more questions Your Honor. |
| JUDGE: | Mr. Bowles. |
| MR. BOWLES: | I'm sorry, [unintelligible – 12:08:37] Judge my apologies. |
| | I've seen this document from opposing attorney, but I'm going to ask you does it look familiar? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. Does it approximate the payment that you paid at the time of closing? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. I'd like to mark that as plaintiff's exhibit 17. |
| | And, you had a payment schedule that was set up where you walked through all your payments and I believe that was plaintiff's exhibit 11. And you were marking down the payments on the right-hand column? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Those are your actual payments? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay, and these were based on what they were demanding of you—of your mother to pay each month correct? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. And, the—when were the first set of taxes that went sideways that they didn't pay? Was it year one? Year two, three or five? |
| MS. SHAVLOVSKIY: | It was the—the delinquent taxes was for 2005. So, the year we obtained the loan. |
| MR. BOWLES: | Okay, and—and they didn't pay those until when? |
| MS. SHAVLOVSKIY: | 2008. |
| MR. BOWLES: | Okay. And did that affect how much they were demanding from you each month? |

42

707220.0032/5074280.1707220.0032/5074280.1

EXHIBITEXHIBIT _10_
PAGE _42_

| | |
|---|---|
| MS. SHAVLOVSKIY: | Oh, yes. |
| MR. BOWLES: | Okay. And did that also affect then whether or not they were saying you were current or behind? |
| MS. SHAVLOVSKIY: | Oh definitely. We started out with $1,935 and every month for some reason payment kept on changing and going up. And then it's—it went up to 21—a little over $2,100 a month. And then when we received delinquent taxes note it went up another almost $400. |
| MR. BOWLES: | Did you talk to the bank about these taxes at all? |
| MS. SHAVLOVSKIY: | Oh yes I did. |
| MR. BOWLES: | What was their response? |
| MS. SHAVLOVSKIY: | They said the—all we know is just the taxes were not paid in 2005 and it's not their problem. |
| MR. BOWLES: | Okay. Did they ever make any attempt to adjust the account for you and your mother? |
| MS. SHAVLOVSKIY: | No, never. |
| MR. BOWLES: | Okay. In the payments that are shown on the far right-hand column of plaintiff's exhibit 11, did you reach that figure or did they—the bank reach that figure? Where you paying in response to a [stops speaking] |
| MS. SHAVLOVSKIY: | I was paying—we were paying in response of the bill they sent each month. |
| MR. BOWLES: | Okay. Did you—how many—how many times did you talk, on your mother's behalf, did you talk to the bank about getting this account adjusted? |
| MS. SHAVLOVSKIY: | I called them many times. |
| MR. BOWLES: | How many times do you think? |
| MS. SHAVLOVSKIY: | Well, about this issue, about I know seven times. |
| MR. BOWLES: | Did they ever make any concession? |
| MS. SHAVLOVSKIY: | No. |
| MR. BOWLES: | Okay. If no objections I'd like to enter [stops speaking] |
| JUDGE: | No objection to 17. It's received. |
| MR. BOWLES: | Just one last thing I want to go over real quick. In looking at this account in here on the trust, it says the current loan rate is how much? |
| MS. SHAVLOVSKIY: | 5.875 percent. |
| MR. BOWLES: | Okay and this is the date of this document is 26th May? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. And it's saying your how months delinquent then? |

EXHIBIT 10
PAGE 43

| | |
|---|---|
| MS. SHAVLOVSKIY: | Three months. |
| MR. BOWLES: | Okay, and if you were to take your monthly loan payment for three months as alleged here how much would that payment be? |
| MS. SHAVLOVSKIY: | $4,900. |
| MR. BOWLES: | So, is that payment more or less than what would be due based on what they're saying you're behind? |
| MS. SHAVLOVSKIY: | It's—it's much more than that. |
| MR. BOWLES: | Okay. So, is it to say that this is even in excess of what you owe? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay. And if you look at the plaintiff's exhibit 16 and it's stating you're seven months behind at that interest rate, if you were to take seven times the monthly interest rate it would be how much? |
| MS. SHAVLOVSKIY: | $11,446. |
| MR. BOWLES: | And is that more or less than what they're saying was due? |
| MS. SHAVLOVSKIY: | They're saying I owed more than [stops speaking] |
| MR. BOWLES: | To? |
| MS. SHAVLOVSKIY: | $13,761. |
| MR. BOWLES: | Okay and so just to have this straight in our heads, if you look at the calculations of the loan payments interest only, you take your interest only payment and you times it by that month and you have what it was due that's what you're comparing it to? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | Okay and the sum that they were saying was due to the investors was that more or less than that calculation? |
| MS. SHAVLOVSKIY: | It's more than that calculation. |
| MR. BOWLES: | Okay, and then the sums on the default notices which was greater? |
| MS. SHAVLOVSKIY: | Default notices was much greater than this security—security paper and much more of course than what the—my calculation of scheduled payment is. |
| MR. BOWLES: | Did you ever attempt to talk about this with the bank? |
| MS. SHAVLOVSKIY: | Yes. |
| MR. BOWLES: | And what was their response? |
| MS. SHAVLOVSKIY: | Their response that, you know, whatever scheduled to pay I have to pay. |
| MR. BOWLES: | All right. Nothing further Judge. |
| JUDGE: | All right so I want to make sure I have this right. You're telling the court that if I were to add these numbers up all the way down I come up with |

707220.0032/5074280.1

EXHIBIT 1 D

PAGE 44

|                    | $67,000?                                                                                                                                                                                                           |
|--------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| MS. SHAVLOVSKIY:   | I believe it to be correct.                                                                                                                                                                                           |
| JUDGE:             | I don't think so.                                                                                                                                                                                                    |
| MS. SHAVLOVSKIY:   | You don't? It's—it's a problem [stops speaking]                                                                                                                                                                      |
| JUDGE:             | You got your—and you got your calculator there right? I count, I think 52 loan payments of $1,635. 60 sorry. So there's 60 times $1,635 right? Is that correct?                                                       |
| MS. SHAVLOVSKIY:   | Yes.                                                                                                                                                                                                                  |
| JUDGE:             | That's what you have on the sheet there? Right? And that totals $98,100.                                                                                                                                             |
| MS. SHAVLOVSKIY:   | Okay.                                                                                                                                                                                                                 |
| JUDGE:             | All right. And then there's 1, 2, 3, 4, 5 payments at the $974, you'd agree with me though that just on that 1,635…                                                                                                  |
| MS. SHAVLOVSKIY:   | Yeah.                                                                                                                                                                                                                 |
| JUDGE:             | …that there are more than the $67,000 payment.                                                                                                                                                                       |
| MS. SHAVLOVSKIY:   | Well I didn't add them separately just the program.                                                                                                                                                                  |
| MR. BOWLES:        | It's an Excel program [unintelligible – 12:16:44]                                                                                                                                                                    |
| MS. SHAVLOVSKIY:   | Excel program you [stops speaking]                                                                                                                                                                                   |
| JUDGE:             | I—I understand all that I'm just—similar to Charlie Daniels, I'm sort of a simple man, and so to me I just sort of add these up and I multiply them up on a calculator and I come up with far more than that $67,000. That's what why I was trying to figure. Now, you would agree that this… |
| MS. SHAVLOVSKIY:   | Okay.                                                                                                                                                                                                                 |
| JUDGE:             | …if I—if I counted them up right in which I believe I have, and that— I've used the $1,635 that's well more than in excess of that $67,000.                                                                          |
| MS. SHAVLOVSKIY:   | Yes.                                                                                                                                                                                                                  |
| JUDGE:             | And then it was in addition to that number you add in the $19,000 then…                                                                                                                                             |
| MS. SHAVLOVSKIY:   | Right.                                                                                                                                                                                                                |
| JUDGE:             | … the $6,000 on top of all that. All right. You may step down. Thank you.                                                                                                                                           |
|                    | Any additional witness or evidence you want to present?                                                                                                                                                              |
| MR. BOWLES:        | No judge, actually we can go ahead and argue on the [stops speaking]                                                                                                                                                 |
| JUDGE:             | Okay, you got about five minutes each to argue.                                                                                                                                                                      |
| MR. BOWLES:        | Okay.                                                                                                                                                                                                                 |
| JUDGE:             | Go ahead. I'll let Mr. Bowles go first.                                                                                                                                                                              |

45

EXHIBIT  /0
PAGE  45

| | |
|---|---|
| MR. BOWLES: | Thank you. |
| JUDGE: | Yep. |
| MR. BOWLES: | Judge, I think it's important that the—that the homeowner has a right to question what they are demanded to pay and that what threw this thing into an accounting problem was the bank's failure to apply the taxes— the property tax payment that they were holding onto. |
| JUDGE: | That's only a small number that it's... |
| MR. BOWLES: | That is a small number Judge. |
| JUDGE: | ...it's—it's a tiny... |
| MR. BOWLES: | ...That is [stops speaking] |
| JUDGE: | ...it's a tiny, tiny number of the number that your client—in my understanding just to—just to I think I've been pretty patient here. Just to sort of give you an idea where I'm coming from again, not to use overdo the reference, but like Charlie Daniels I find myself to be a very, very simple man, I like to keep things very simple, and to me, I think you do have to demonstrate to the Court by clear and convincing evidence that there is a likely chance that you would prevail on the merits of the default itself and I don't think you're going to get there on the I just [stops speaking] |
| MR. BOWLES: | But Judge that's a federal standard. And the state's standard is to maintain the status of quo and they always have the property. |
| JUDGE: | I get that. But I still think you've got to demonstrate to me that there's some, at least some likelihood, but if I use preponderance for even a lesser standard, some likelihood that you're going to prevail on anything here, and I don't, I just, your client's in default. The person who did the finances, even with—eventually she got there by her own admissions by doing her own simple math, is clearly in default on this loan, is a significant amount in default on this particular loan here. |
| MR. BOWLES: | At the first of the year, Judge, but at the time when she stopped payment, if you look at that category, Judge, she was not that far behind. If you follow the tabulation in that in which [stops speaking] |
| JUDGE: | ...she was way behind. She was still, I—I did, I think she was like—I want to say she was about $16,000—at first, when they sent the notice of about—of the $12,000, they were pretty darn close. And the $12,000 might have been, or the $22,000 might have been off a little bit, but they were still—still pretty darn close. |
| MR. BOWLES: | Judge, the reason they are having these problems is because the bank had those funds and they didn't apply them correctly. And they didn't pay the property taxes for three years. And—and that is a—that is a—an error that threw everything into a—a state of catty wonkus and she was entitled to say you guys are not sending me correct bills. And [stops |

46

EXHIBIT 10
PAGE 46

speaking]

JUDGE: I would agree with you. If that was the only issue.

MR. BOWLES: It's [stops speaking]

JUDGE: I would agree with you and you—you would probably prevail here, but if—there's more than just that. You would agree that there's far more than just the taxes at issue.

MR. BOWLES: By now Judge, I'd say yes, it is been exacerbated but we are not having this show cause or this preliminary hearing this—this hearing on the preliminary injunction Judge on this date not because we have requested the set overs, but because they wanted to bring in somebody else to argue on the benefit of MERS.

The—once you came into court the judge said $3,500 is sufficient security, that is to maintain the status quo Judge, we have a civil suit in which to resolve these issues. Anybody in default with their bank, if we presume that all they can say is you're behind, here's your default notice, we're going to foreclose and you have no basis in which to question it because following the defendants reasoning we can't seek a TRO because we haven't been damaged. If it's only upon a sale that is the final resolution Judge and that means that they don't get to keep the property [stops speaking]

JUDGE: I disagree with their argument on that. I—I don't have a problem with that, but I just—I still think there's more.

MR. BOWLES: Okay.

JUDGE: Are you done then?

MR. BOWLES: Just one last point Judge is that this is claimed to be owed by the secured highest trust. The secured highest trust is explicit in saying that the assignments of the deed of trust and the mortgages I—I point the court to page 23 where it says loans, mortgages and related mortgage notes each transferred to sign to the trustee pursuant to the provisions hereof—hereof as from time-to-time are held part of the trust fund and identified in the loan schedule each...

JUDGE: What difference does it...

MR. BOWLES: ...loan.

JUDGE: ...make who your client owes?

MR. BOWLES: I'm sorry judge?

JUDGE: What difference does it make who your client owes? From—from your client's perspective of whether or not she's in default on her loan what difference does it make who she's in default to?

MR. BOWLES: Judge, a debtor may have claims of recoupment, may have claims of offset, may have claims to the actual note, but for one party to stand in

47

EXHIBIT 10
PAGE 47

the middle and essentially cloud that ability to deal with the ultimate creditor does complicate things Judge. I mean to the point where we're having to go in here and say okay, it's been assigned to a trust, we have to go back into the trust schedule to see exactly what the ultimate creditor's being paid. That's significant Judge.

What is happening here is that MERS is attempting to act as a beneficiary. They're not a beneficiary Judge. They have no basis to stand in the position of a beneficiary. They may be an agent, but they are not the beneficiary. It doesn't matter what the trust deed says Judge, that is not a document my client drafted and [unintelligible – 12:23:05] my client does not have English fluency. But just because they say she's a beneficiary—or that MERS is a beneficiary does not make them the beneficiary.

So that comes down to Judge who are they dealing with? Who ultimately are they dealing with? It says that the deed of trust is for the benefit of Pacific Mortgage.

| | |
|---|---|
| JUDGE: | Sierra. |
| MR. BOWLES: | That—that assignment when it was assigned in 2009 didn't belong to them. They have a broken chain of title Judge. And they're trying to enforce the security agreement. |
| JUDGE: | But didn't—didn't your client's daughter know exactly who to talk too? |
| MR. BOWLES: | I'm sorry? |
| JUDGE: | Didn't your client's daughter know exactly who to talk to regarding the loan? |
| MR. BOWLES: | Judge they had to deal with the servicer and that's typically what happens. Is… |
| JUDGE: | So that… |
| MR. BOWLES: | …that the servicer… |
| JUDGE: | …so they knew… |
| MR. BOWLES: | …is not [stops speaking] |
| JUDGE: | …so they knew who to talk to. |
| MR. BOWLES: | But the servicer is not the creditor. |
| JUDGE: | All right. I gave you five minutes. |
| MR. PRATTE: | Thank you Your Honor and you—I was just telling my co-counsel, you're the most patient judge I've appeared before in 35 years. |

I think you're correct Your Honor on the analysis of the—the kink here [unintelligible – 12:24:09] in default I think it's beyond question. I think the simple math that I was doing and which you confirmed supports the default. I think this—this notion of MERS is not the beneficiary I think

48

EXHIBIT 11

PAGE 48

is simply incorrect as a matter of law. They were a benefit—they aren't—you're right they're an agent. Without question they are the agent of a lender who successes and assigns. All they did is assign it to HSB, which is by their own admission the party that is the trust deed for the trust. Not the trust deed for the—for the—for the deed. So I think it is absolutely clear, I don't think there are any assignments out there that are missing the securitization documents are frankly irrelevant, they don't have any bearing on who we—who you pay the debt to. Servicers are the only ones that have staff to collect debts for. If they want to sort of claim a recoupment or anything else it's—I've done mortgage banking for 35 years they're serving as servicers all the time. About the only one that can't assert is rescission under truth and lending. That has to go against the owner of the debt. But this is—there's no rescission right here because it's a purchase loan, so that doesn't apply in any event. So I think it is—I think it is abundantly clear. I don't think the standards for an injunction have been met.

I will also say that—and I will commit to this court, that if there has been a mathematical error in the calculation so that her payments have not been credited, or they were charged for late fees on real estate taxes, I will commit to the court, we will investigate that and make darn sure that didn't happen. Because my understanding is that those problems have been resolved. Because that would be—that would be completely wrong. And I've represented Wells Fargo for years, sure. They make mistakes like anybody but that kind of mistake if that happened, that's got to be fixed, that would be credited to any amounts that we've claimed, you know, under the—under the deed of trust. That's a matter of our talking to the servicing people and getting that—and getting that straightened out.

I think Oregon law is very clear. I think MERS can be a beneficiary, I think the courts are recognizing it, I think where some courts are struggling is the notion as to whether it's an assignment of the note is that somehow an assignment of the deed and I submit that it is not. We're mixing up two bodies of the law. Nowhere is that required. And I think that's all I can say Your Honor.

Thank you for your patience.

JUDGE: To the court MERS issue is just essentially a red her—it's just a red herring to the court. Really what this comes down to is we have a borrower and a lender and they reached an agreement and both parties have to fulfill their ends of that agreement. And the public policy in this area would be one, that people are allowed to fairly deal with each other in these capacities and then the people pay back those loans. To me, it's a simple way of taking a looking at this. I don't think that there's much success of plaintiff being able to prevail on this particular matter in the sense of clearly in default, clearly in default by significant amount of money, and in default in more than enough time that it will allow for

49

EXHIBIT   10
PAGE   49

whoever holds the basically the loan to default on that loan, and therefore, drew a nonjudicial foreclosure at that point in time.

Therefore, the court's finding that the temporary restraining order—or the injunction at this point and time is going to be denied and if they want to go forward with their foreclosure they're allowed to do so. And if there's any error after that they can sue for damages from that point on.

MR. BOWLES:    Judge? Just for clarification sake, are we saying that MERS is [unintelligible – 12:27:57] for a party to conduct a foreclosure?

JUDGE:    I'm saying the lender of the loan is a person who can go forward and conduct a foreclosure.

MR. BOWLES:    Okay. Thank you judge.

MR. PRATTE:    Thanks Your Honor. It's been a pleasure.

LINDI L. BAKER, Circuit Judge
MICHAEL NEWMAN, Circuit Judge

PAT WOLKE, Circuit Judge

COSGRAVE VERGEER KESTER LLP
RECEIVED

MAY 1 6 2011

NOTED BY_____ SPINDLE_____
FILED BY_____

## OREGON JUDICIAL DEPARTMENT
### Josephine County Court

May 11, 2011

Mr. Richard Billin
Attorney at Law
PO Box 279
Medford, Oregon 97501

Mr. John Thomas
Attorney at Law
11830 SW Kerr Parkway Suite 385
Lake Oswego, Oregon 97035

Mr. Robert Sabido
Attorney at Law
805 SW Broadway 8th Floor
Portland, Oregon 97205

Re: Nigro v NW Trustee Services and Wells Fargo Bank; 11CV0135

Dear Counsel:

This matter came before the court on April 12, 2011 on plaintiff's motion seeking a preliminary injunction to prevent the non-judicial sale of his residence by the defendants. Plaintiff agrees he is in default on the monthly payments on his promissory note. He argues that he has made a sufficient showing that he is entitled to the preliminary injunction. The defendants argue that the plaintiff's motion should be denied. To prevail, plaintiff must establish four elements. Each is discussed in turn:

1. Likelihood of prevailing on the merits.
Plaintiff must show that he is likely to prevail on the merits of his complaint. Plaintiff's complaint alleges two claims for relief. His first claim for relief, that the non-judicial foreclosure is wrongful, has two separate arguments: (1) that the defendants failed to provide plaintiff with the notice required by ORS 86.737 and failed to comply with other provisions of the Oregon Trust Deed Act, ORS 86.705 to 86.795; and (2) that the involvement of the "strange entity" called MERS fails to comply with those statutory requirements. His second claim for relief, to quiet title, is based on the argument that, because the original lender has been paid in full, the purpose of the note and trust deed has been fulfilled so plaintiff should have title quieted in his favor.

Taking his second claim first, plaintiff expressly alleged that he became delinquent on the loan (Complaint ¶4) and he testified that he has been unable to make his loan payments since June 2010. Given that plaintiff, by his own admission, has not complied with his obligations under the note and trust deed, it is highly unlikely that he will prevail on his quiet title claim.

As for his first claim for relief, first regarding the notice required by ORS 86.737, plaintiff has shown that defendants likely have failed to comply with the procedures set forth in that statute. Plaintiff has testified, under oath, that although he did receive the notice of sale as required by ORS 86.745 (Complaint, Exhibit D), he did not receive the Informational Notice and Modification Request Form as required by ORS 86.737 (Wells Fargo's Opposition, Decl of Taggart, Exhibit A pp 2-6). Defendants have submitted an affidavit showing that the latter notice was in fact mailed by certified mail, return receipt requested; however, the affidavit was signed contemporaneously with the mailing, so the defendants have not shown that the certified mail was actually signed for by plaintiff. Although the defendants have shown that plaintiff did not in fact request a modification (Wells Fargo's Opposition, Decl of Taggart, Exhibit A pp 7-8), this is not inconsistent with plaintiff's claim that he never received the mailed documents

EXHIBIT _11_
PAGE _1_

in the first place. Statute requires that the notice of sale under ORS 86.745 be served in the manner specified in ORS 86.750. However, if the informational notice under ORS 86.737 is not properly served, the non-judicial sale may nonetheless proceed. ORS 86.739. Therefore, even if plaintiff did not in fact receive the informational documents, the defendants' omission does not preclude the non-judicial sale. Accordingly, plaintiff is not likely to prevail on this argument.

Plaintiff also argues that the defendants have violated the Oregon Trust Deed Act by failing to record all transfers of the note and trust deed as required by those statutes. As defendants point out, however, transfers of the note need not be recorded, only transfers of the trust deed and appointments of successor trustees. ORS 86.725. As that statute makes clear, recordation is required as a prerequisite to proceeding with a non-judicial foreclosure. The statute does not specify that a period of time must pass after recordation before initiating non-judicial foreclosure proceedings. In this case, the necessary assignments appear to have been recorded, all on the same date and three days before initiating the non-judicial foreclosure (Exhibits B and C, attached to plaintiff's Complaint; Wells Fargo's Opposition, Decl of Taggart, Exhibit A pp 9-15). Accordingly, plaintiff is not likely to prevail on this argument.

Plaintiff's second argument is based on the involvement of MERS. He argues, with reference to both claims for relief, that the involvement of MERS is improper in a number of ways (Complaint ¶6D, E, and F). He cites the case of McCoy v BNC Mortgage, Inc, an unpublished Oregon bankruptcy court case involving circumstances much the same as the present matter. That court found, in the context of the defendant's motion to dismiss the plaintiff's claim of wrongful foreclosure,  that MERS cannot be the beneficiary, despite the trust deed explicitly stating so, because the term is defined by statute "as the person for whose benefit a trust deed is given or the person's successor in interest." MERS was designated a nominee and MERS evidently was acting beyond the authority granted to it by the named beneficiary.

Plaintiff notes conflicting authority, and the defendants in their opposition cite that conflicting authority among others. The case of Bertrand v SunTrust Mortgage, Inc, 2011 US Dist LEXIS 31442 (D Or March 23, 2011), also involves facts very much like those of the present matter. That court, however, found that despite the trust deed not being made to MERS's benefit, MERS is specifically designated as the beneficiary and had the authority to assign the beneficiary's interest. That court concluded that "to the extent plaintiffs challenge the foreclosure sale on the basis of MERS' involvement, plaintiffs' claims are without merit." (2011 US Dist LEXIS 31442 at 12).

This court finds the reasoning in Bertrand to be the more convincing. MERS appears never to have been intended to be a party to the trust deed transaction. It appears to be specifically listed as a nominee for the purpose of being able to ensure that, in the case of an obligor's default, the proper parties could be assigned the beneficial interest in furtherance of appropriate action to enforce the trust deed. See Burgett v MERS, 2010 US Dist LEXIS 112286 (D Or October 20, 2010). Bertrand furthers that purpose, while McCoy is an obstacle to that purpose. Nothing in the Oregon Trust Deed Act is inconsistent with this purpose. Accordingly, plaintiff is not likely to prevail on his MERS-based argument.

2. Likelihood of irreparable harm in the absence of preliminary relief.
In addition to showing that he is likely to prevail on the merits, plaintiff must show that he is likely to suffer irreparable harm in the absence of preliminary relief. While loss of his home is likely irreparable, plaintiff is likely to lose his home in any event due to his failure to make payments. Preliminary relief is likely only to delay the inevitable. Therefore, plaintiff has not established the likelihood of irreparable harm if the court were not to grant the preliminary injunction.

3. Balance of equities.

EXHIBIT _11_
PAGE _2_

Plaintiff has not shown that the balance of equities tips in his favor. He is not able to make the payments he contracted for, and even now he offers to pay only $500 per month if the court were to require him to post security.

4. Public interest in issuance of preliminary relief.

Finally, plaintiff has not shown that the public interest favors issuance of the preliminary injunction. Non-judicial foreclosures are expressly provided for by Oregon statute, ORS 86.705 to 86.795, which this court takes to be the legislature's expression of the public interest. Plaintiff has not shown that the defendants have violated this procedure such that the court should interfere with the process.

In sum, plaintiff has not shown that he is entitled to a preliminary injunction in this matter. The temporary restraining order previously obtained by plaintiff therefore will be terminated as well. Mr Thomas, please prepare an appropriate order consistent with the court's decision.

Yours truly,

Michael Newman
Circuit Judge

MN:ls

EXHIBIT    11
PAGE    3