

# FIFTH JUDICIAL DISTRICT
### COUNTY OF CLACKAMAS
COUNTY COURTHOUSE, OREGON CITY, OREGON 97045

July 6, 2011

Elizabeth Lemoine                    Elizabeth@lubylaw.org
Luby Law Firm

Christopher Kayser                   cjkayser@larkinsvacura.com
Larkins Vacura, LLP

Lisa McMahon-Myhran                  lmcmahon@robinsontait.com
Robinson Tait, PS

Re:   *Chris Somers et ux v. Deutsche Bank National trust Company, et al.*
     Case No. CV11020133
     Case No. FE110027

Counselors:

As alleged in the Complaint filed in CV11020133, unless otherwise identified, the operative facts of the case are –

-    On or about October 27, 2004, plaintiffs Chris and Lana Somers (hereinafter referred to as "Somers") borrowed $445,000 from IndyMac Bank, FSB. The loan is pursuant to an Adjustable Rate Note made and delivered by Somers dated October 19, 2004 (hereinafter referred to as "the Note").[1]

-    On or about October 27, 2004, Somers executed and delivered a Deed of Trust to real property commonly known as 21463 Rosepark Court, West Linn, Oregon, as security for the Note. [Exhibit A to the Complaint, hereinafter referred to "the Security Instrument"] The Security Instrument provides as follows –

      -    Chris Somers and Lana Somers are identified as "Borrower."

      -    IndyMac Bank, FSB, is identified as "Lender".

      -    Pacific Northwest Title Insurance Co., In (sp) is designated as the Trustee.

---

[1]  A copy of the Note is Exhibit 1 to Somers' Response to Defendants Rule 21 Motion to Dismiss.

EXHIBIT  1
PAGE  1

- Mortgage Electronic Registration Systems, Inc. ("MERS") is the "nominee" for Lender and Lender's successors and assigns, and is expressly designated to be the beneficiary under the Security Instrument.

- The Security Instrument contains this text:

  The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender * * *. For this purpose, Borrower irrevocably grants and conveys to trustee, in trust, with power of sale, the following described property * * *.

  Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any and all of those interests, including, but not limited to, the right to foreclose and sell the property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

  * * * * *

  **20. Sale of Note; Change of Loan Servicer; Notice of Grievance**. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects periodic Payments due under the Note and this Security Instrument * * *. There might also be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser. * * *

EXHIBIT ___1___
PAGE ___2___

-   On or about December, 2009, Somers became delinquent on the loan, although the nature of the delinquency is not plead.

-   On or about March 19, 2010, MERS assigned the Deed of Trust to Deutsche Bank National Trust Company (hereinafter referred to "Deutsche Bank") as the trustee of the IndyMac INDX Mortgage Trust 2007-FLX4, Mortgage Pass-Through Certificates, Series 2007-FLX4 under the Pooling and Servicing Agreement dated May 1, 2007 (hereinafter referred to as "the Mortgage Trust").

    On or about that same date, Deutsche Bank, by and through OneWest Bank, FSB, its attorney-in-fact, appointed Regional Trustee Services Corporation (hereinafter referred to as "RTSC") successor trustee to Pacific Northwest Title Insurance Co., Inc.

-   In March, 2010, Somers received a Notice of Default and Election to Sell from RTSC, which Notice set July 23, 2010, as the sale date.

-   From February, 2010, through November 22, 2010, Somers and the Mortgage Trust communicated concerning a possible loan modification, during which time the Mortgage Trust informed Somers' attorney that the July 23, 2010, sale was postponed indefinitely.

-   On November 30, 2010, the Mortgage Trust mailed Somers a writing stating that the loan could not be modified.

-   On December 1, 2010, with no prior notice of sale to Somers, RTSC conducted the foreclosure sale.

In their First Claim for Relief, Somers allege that the foreclosure sale was wrongful because –

A.  "The beneficial interest of the trust deed" has been assigned multiple times without recording those assignments as required by ORS 86.735, therefore the trustee lacked authority to conduct a sale.

B.  MERS did not have authority to assign the Deed of Trust to Deutsche Bank; and, the recital of MERS as the beneficiary in the Deed of Trust is a sham.

C.  The Closing Date of the Mortgage Trust (presumably for the acquisition of debt instruments) was on or about May 30, 2007, almost three years before MERS made the assignment of the Security Instrument.

D.  MERS had no authority to act for IndyMac, FSB, in March, 2010, when MERS undertook to assign to Deutsche Bank, because IndyMac, FSB, did not exist on that date.

EXHIBIT 1
PAGE 3

E.    MERS had no authority to assign the Note.

F.    On the premise that MERS' assignment to Deutsche Bank is invalid, Deutsche Bank's appointment of RTSC as successor trustee is also invalid.

In their Second Claim for Relief, against the Mortgage Trust only, Somers allege the Mortgage trust made false or misleading statements to them regarding the loan modification effort and the foreclosure sale, in violation of the Unlawful Trade Practices Act.

In their Third Claim for Relief, Somers seek a declaratory judgment that none of the defendants have a legal or equitable interest in the Rosepark Court property.

On June 28, 2011, I signed the Stipulation and Order of Dismissal of Defendant Regional Trustee Services Corporation that was signed and submitted by counsel for Somers and RTSC. Counsel for Somers is instructed to submit for my signature by no later than July 20, 2011, a Limited Judgment consistent therewith.

The remaining defendants bring ORCP 21.A(8) motions to dismiss each of the three claims made in the Complaint.

ORS 86.705(1) provides that, in a Deed of Trust subject to Oregon law, "'Beneficiary' means the person named or otherwise designated in a trust deed as the person for whose benefit a trust deed is given, or the person's successor in interest, * * * ."

In the Deed of Trust at issue here, IndyMac Bank, FSB, is identified as the Lender. Further, in bold typeface, MERS is identified as the beneficiary. That MERS and its successors, as the named beneficiary, is the nominee of the Lender and its successors is not contrary to Oregon law and is consistent with the express terms of the Deed of Trust made and delivered by the Somers.

Under the facts alleged, the assignment from MERS to Deutsche Bank as the beneficiary of the Deed of Trust was recorded in due course. At the time the Deed of Trust was assigned to Deutsche Bank, Deutsche Bank was also the holder of the Note. That the Mortgage Trust served by Deutsche Bank as trustee acquired the Note some three years prior to the assignment to Deutsche Bank of the beneficial interest under the Security Instrument is not dispositive of any issue before the court. That the holder of the Note is the trustee of a mortgage-back security pool does not in any way impact the Somers' rights and privileges under their transaction documents or Oregon statutes relating to the giving of a Deed of Trust or the foreclosure thereof.

Under the facts alleged, the designation of RTSC as successor trustee was recorded in due course.

EXHIBIT    1
PAGE    4

In accord with the foregoing, the motion to dismiss the First Claim for Relief in CV11020133 is granted.

The motion to dismiss the second claim for relief in CV11020133 is also granted. The gravamen of the Second Claim is that the Mortgage Trust made false and misleading statements to Somers, which apparently Somers relied on to their detriment either by refraining from selling the real property prior to the foreclosure sale or in failing to otherwise reinstate the loan prior to the foreclosure sale – apparently in reliance on Deutsche Bank's statement that the foreclosure sale was not going to occur. Somers may have a claim under the UTPA, but with so much storytelling and pleading of evidence the specifics of the claim are uncertain. Similar to a fraud claim, the elements of the claim must be plead with specificity.

The motion to dismiss the third claim for relief in CV11020133 is also granted. Within the four corners of the Complaint, the claim for declaratory relief does not seek a protect a right or obtain a remedy not already put forward.

Counsel for the defendants should submit to the clerk of the court for my signature an Order consistent with this ruling.

The court is mindful that the pending eviction case is set for trial with the CV11020133 case. Somers may replead consistent with this ruling by Amended Complaint filed on or before July 20, 2011. If they need additional time to prepare and file an Amended Complaint, the request for additional time may be addressed to me in a telephone conference. If Somers do not plead further, counsel should arrange among themselves the submission of a General Judgment.

Very truly yours,


*/s/ Roderick A. Boutin*


Roderick A. Boutin, Judge *pro tem*

EXHIBIT ____1____
PAGE ____5____

Columbia County Courthouse
230 Strand St.
St. Helens, OR 97051-2041
(503) 397-2327    FAX (503) 397-3226



Ted E. Grove, Circuit Court Judge
Steven B. Reed, Circuit Court Judge
Jenefer S. Grant, Circuit Court Judge

## CIRCUIT COURT OF THE STATE OF OREGON
## FOR THE COUNTY OF COLUMBIA

June 23, 2011

Jovita T. Wang
Miller Nash LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204-3699

R E C E I V E D

JUN 2 4 2011

MILLER NASH LLP

Thomas H. Cutler
Harris Berne Christensen LLP
5000 S.W. Meadows Road, Suite 400
Lake Oswego, Oregon 97035

     Re:   U.S. Bank National Association, N.A., v. Martha Flynn
           Columbia County Circuit Court Case No. 11-8011

Dear Counsel,

    This letter will serve as my opinion in the above-referenced residential eviction case argued May 24, 2011.  Based on very recent case law, I am finding in favor of the defendant.

    <u>Hooker v. Northwest Trustee Services</u>, with which I am sure both of you are by now familiar, came out the day after this case was argued.  It addressed the question of whether Oregon's recording statute applies in situations where MERS is "acting solely as a nominee for Lender . . . " as was provided in the December 12, 2005, Deed of Trust submitted by plaintiff in this case as Exhibit 8.  The language in the trust deed quoted in <u>Hooker</u> was essentially identical to the language in Exhibit 8 naming MERS as the "Grantee of this Security Instrument," Eagle Home Mortgage as "Lender," and Martha Flynn as the "Borrower."  Exhibit 8 further provides, at Page 3 of 16, "This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note."  Therefore, like GN in Hooker, Eagle Home Mortgage, not MERS, holds the beneficial interest.

EXHIBIT  2
PAGE   1

Hooker goes on to say that the any assignments of the beneficial interest must be recorded in order for a non-judicial foreclosure to comply with the Oregon Trust Deed Act. The defendant presented evidence in Exhibit 104 that by December 4, 2009, and apparently through December 11, 2010, Freddie Mac was the owner of the mortgage and therefore the holder of the beneficial interest in the property. No evidence that this transfer of the beneficial interest was ever recorded was presented by the plaintiff, so I am concluding that the recording never occurred.

In In re McCoy, 446 B.R. 453 (D. Oregon, Feb. 2011), the Bankruptcy Court also found that non-judicial foreclosure may only be authorized where MERS is the beneficiary, and there have not been any unrecorded assignments of its interest. The McCoy court explains that a beneficiary must be the person "for whose benefit a trust deed is given, or the person's successor in interest." When the Borrower still owes the note to the Lender, rather than to MERS, as in the case at bar, MERS does not become the beneficiary, irrespective of what is stated in the deed of trust.

Plaintiff argues that even given the foregoing, because of ORS §86.780 it is free to rely in good faith on the recitals in a recorded trust deed. However, plaintiff does not offer any authority to support its proposal that the specific recording provisions from ORS §86.735(1) are thereby negated.

For all of the foregoing reasons, I am finding in favor of defendant on the eviction complaint, and ordering costs and disbursements to her. A copy of the general judgment is enclosed.

Respectfully,

Jenefer Stenzel Grant
Circuit Judge

Enclosure.

EXHIBIT 2
PAGE 2

REDACTED

MIN: 1000462-0000039429-6     **NOTE**     Loan Number: ▓ 1694

JUNE 19, 2007            PORTLAND            OREGON
[Date]                     [City]                  [State]

30366 SW RUTH STREET #70, WILSONVILLE, OREGON 97070
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $346,438.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is NORTHWEST MORTGAGE GROUP, INC., AN OREGON CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.000 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on AUGUST 1, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JULY 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 10260 SW GREENBURG ROAD, #900, PORTLAND, OREGON 97223

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $2,304.86

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

Borrower Initials: DAV ___ ___ ___ ___ ___

MULTISTATE FIXED RATE NOTE–Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200 1/01      Page 1 of 3

*DocMagic eForms* 800-649-1362
*www.docmagic.com*

EXHIBIT 3
PAGE 1

Us3200.sss-trust

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED
**(A)   Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of **15**
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5 . 0** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.
**(B)   Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
**(C)   Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.
**(D)   No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
**(E)   Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

Borrower Initials: _____  _____  _____  _____  _____  _____

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                              Page 2 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

EXHIBIT _____3_____
PAGE _____2_____

L's3200.not-trust

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
DOUGLAS A. JAMES          -Borrower                              -Borrower

_____ (Seal)      _____ (Seal)
                          -Borrower                              -Borrower

_____ (Seal)      _____ (Seal)
                          -Borrower                              -Borrower

PAY TO THE ORDER OF:        *Countrywide Bank, FSB*
WITHOUT RECOURSE

NORTHWEST MORTGAGE GROUP, INC., AN OREGON CORPORATION

BY: _____

ITS:  KAREN L DIXON                          *[Sign Original Only]*
      SENIOR FUNDER

---

MULTISTATE FIXED RATE NOTE—Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                    Page 3 of 3

DocMagic eFORMS  800-649-1362
www.docmagic.com

EXHIBIT __3__
PAGE __3__

Us3200.not-trust

FILED'11 MAY 17 15:00USDC-ORM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

DAVID M. BUCKLAND,

              Plaintiff,          Civ. No. 11-3053-CL

                                    **ORDER**

      v.

MERS MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC
AS NOMINEE FOR AMERICAN
MORTGAGE NETWORK, DBA
AMERICAN MORTGAGE NETWORK
OF OREGON,

              Defendant.

---

**BROWN, J.**

    *Pro se* plaintiff David M. Buckland requests a preliminary injunction enjoining the foreclosure sale of his home. On May 3, 2011, during my temporary absence, the Honorable Anna J. Brown issued a temporary restraining order (#5). On May 15, defendant MERS filed a motion and declarations opposing a preliminary injunction. On May 17, at 10:00 a.m., I presided over a show-

1 - ORDER

EXHIBIT 4
PAGE 1

cause hearing. As I did not extend the temporary restraining order, the temporary restraining order expired on May 17, 2011, at 11:00 a.m. For the reasons stated below, plaintiff's request for a preliminary injunction is DENIED.

### STANDARDS

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, Inc., 129 S. Ct. 365, 374 (2008). "The elements of [this] test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011)(citing Winter, 129 S. Ct. at 392). Accordingly, the Ninth Circuit has held "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1135. The court's decision on a motion for a preliminary injunction is not a ruling on the

2  - ORDER

EXHIBIT ___4___
PAGE ___2___

merits. See Sierra On-Line, Inc. v. Phoenix Software, Inc., 739
F.2d 1415, 1422 (9th Cir. 1984).

### DISCUSSION

In issuing the temporary restraining order, Judge Brown
noted that ORS 86.753(1) allows foreclosure by advertisement and
sale when "the trust deed, any assignments of the trust deed by
the trustee or the beneficiary and any appointment of a successor
trustee are recorded in the [land records]." Judge Brown noted
that "accepting as true plaintiff's allegations of an unrecorded
assignment of the beneficial interest in the trust deed,
plaintiff has demonstrated a significant issue as to whether the
foreclosure at issue violates the Oregon Trust Deed Act." (Temp.
Rest. Ord., #5, 3. (citing Burgett v. Mortg. Elec. Registration
Sys., Inc., 2010 WL 4282105, at *3 (D. Or. Oct. 20, 2010) and In
re McCoy, 2011 WL 477820, at *3-4 (Bankr. D. Or. Feb. 7, 2011).)

After Judge Brown issued a temporary restraining order, MERS
filed an appearance and a motion opposing a preliminary
injunction. MERS also filed exhibits demonstrating the Josephine
County Circuit Court recently dismissed with prejudice a similar
complaint brought by plaintiff in state court. (Uhl. Decl., Ex.
1-8.).

On August 30, 2010, plaintiff filed a complaint in Josephine
County Circuit Court challenging the non-judicial foreclosure of
his home. Plaintiff named Aurora Loan Servicer as defendant.

3 - ORDER

EXHIBIT ___4___
PAGE ___3___

Although plaintiff did not name current defendant MERS as a defendant in state court, plaintiff's did list MERS in the second claim, and challenged MERS's status as beneficiary and authority to assign the trust deed. (Uhl Decl., Ex. 1, 8.) Following oral argument on defendant's motion to dismiss, the state court granted the motion and granted plaintiff 20 days to file an amended complaint. Plaintiff failed to file an amended complaint and on March 18, 2011, the state court entered a general judgment dismissing the complaint with prejudice. (Uhl Decl., Ex. 8, 2.)

Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must "give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 81 (1984). Because the prior judgment here was issued by an Oregon court, this court looks to Oregon law on claim preclusion.

"The doctrine of claim preclusion, formerly known as *res judicata*, generally prohibits a party from relitigating the same claim or splitting a claim into multiple actions against the same opponent." Bloomfield v. Weakland, 339 Or. 504, 510, 123 P.3d 275, 279 (2005); see also Or. Rev. Stat. § 43.130. "[A] plaintiff who has prosecuted one action against a defendant through to a final judgment binding on the parties is barred on res judicata grounds from prosecuting another action against the same

4 - ORDER

EXHIBIT ___4___
PAGE _____4

defendant where the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks a remedy additional or alternative to the one sought earlier, and is of such a nature as could have been joined in the first action." Rennie v. Freeway Transport, 294 Or. 319, 323, 656 P.2d 919, 921 (1982) (citations omitted). "Well-settled principles of claim preclusion 'foreclose[ ] a party that has litigated a claim against another from further litigation on that same claim on any ground or theory of relief that the party could have litigated in the first instance.'" Lincoln Loan Co. v. City of Portland, 340 Or. 613, 619-20, 136 P.3d 1, 4-5 (2006) (quoting Bloomfield, 339 Or. at 511, 123 P.3d at 279) (emphasis omitted), cert. denied, 127 S. Ct. 1333 (2007).

Plaintiff has failed to demonstrate a sufficient likelihood of success on the merits to justify a preliminary injunction. Upon reviewing the state court complaint and the current complaint, plaintiff's claims appear to be based on the same operative facts. Further, it appears plaintiff either brought the current claims or theories in state court, or could have raised the current claims or theories in state court.

In Oregon, claim preclusion protects parties in privity with prior parties. Secor Investments, LLC v. Anderegg, 188 OR.App. 154, 167, 71 P.3d 538, 545-56 (2003). A party whose interests are represented by the previous party may be in privity with the

5  - ORDER

EXHIBIT 4
PAGE 5

prior party. Id. As noted by defendant, MERS and Aurora Loan

Services both acted as an agent of the beneficiary of the same

loan. While Aurora serviced the loan on behalf of the beneficiary

of the trust deed, MERS (as holder of legal title to the trust

deed) acted as the agent or nominee of the beneficiary. As noted

above, plaintiff listed MERS in his second claim in the state

court complaint. In short, the two complaints allege nearly

identical facts and both challenge agents acting on behalf of the

beneficiary of the trust deed. I conclude plaintiff has not

demonstrated sufficient questions going to the merits of this

case to warrant a preliminary injunction.

At the May 17, 2011 oral argument, plaintiff stated that the

state court judge was not fully aware of the issues involving a

claim of failure to record in violation of ORS 86.735(1). If

plaintiff felt the state court trial judge made an error of law,

plaintiff had the right to appeal the dismissal to the Oregon

Court of Appeals, but not to this district court.

Additionally, at the May 17, 2011 oral argument, plaintiff's

wife stated that she did not believe the recording claim was

raised in state court. A review of plaintiff's state-court

response to defendant's motion to dismiss, however, reveals that

plaintiff did raise the recording issue before the state court

judge. (Uhl Decl., Ex 6, 1-6.) Plaintiff dedicated two pages of

his response to arguments involving MERS. (Uhl Decl., Ex. 6, 2-

6  - ORDER

EXHIBIT ___4___

PAGE ___6___

3.) Additionally, citing a Judge Hogan decision, plaintiff expressly made the failure-to-record argument alleging defendant violated ORS 86.735(1). (Uhl. Decl., Ex. 6, 3.)

I therefore conclude that plaintiff is not entitled to a preliminary injunction as plaintiff has not demonstrated serious questions going to the merits. My conclusion here is not a ruling on the merits. <u>Sierra</u>, 739 F.2d at 1422. The matter is now referred to Magistrate Judge Clarke for further proceedings.

Judge Brown required plaintiff to post a $500 bond for purposes of security. The clerk is ordered to return plaintiff's security with a copy of this order.

### CONCLUSION

Plaintiff's request for a preliminary injunction is DENIED. This case is referred to Magistrate Judge Clarke for further proceedings. The clerk is ordered to return plaintiff's security with a copy of this order.

IT IS SO ORDERED.


DATED this __17__ day of May, 2011.


OWEN M. PANNER
U.S. DISTRICT JUDGE

EXHIBIT __4__
PAGE __7__

# SETTING THE RECORD STRAIGHT ON
# MERS

BY ALLEN H. JONES



**The foreclosure crisis ignited a media firestorm around the legitimacy of an electronic registry built by the industry to track ownership of mortgages and servicing. It's taking a while to get to the truth.**

ILLUSTRATION BY LEO ESPINOSA

EXHIBIT 5
PAGE 1

I t has been decried as a shell corporation. Deemed a destroyer of the Colonial-era land-records system. Its most outspoken critics have argued its very existence marks the demise of the institution of property rights. ■ Despite the unforgiving censure of Reston, Virginia–based Mortgage Electronic Registration Systems Inc. (MERS) in the media, its right to exist, to hold legal title to a mortgage and to foreclose all have been maintained by numerous local and state courts. ■ These decisions, along with recent organizational transformation and procedural changes within MERSCORP Inc., MERS' parent company, could mean the storm of litigation challenging its standing is finally tapering off. But MERS remains largely misunderstood by the public, and is almost regularly berated by the media. ■ As a result, politicians are distancing themselves from MERS. Do such maneuvers indicate awareness of a potential liability or is it simply that the public relations risk is just not worth the cost?

Amidst the din, it is hard to tell. Absent from most of the discourse is an unbiased portrait of MERS, with a history of how and why it emerged, the value it confers to the mortgage lending supply chain and the real problems it faces today with respect to a recent regulatory consent order.

The MERS® System is the registry operated by MERSCORP. MERS is a wholly owned subsidiary of MERSCORP. References in this article to MERS are to the subsidiary. The subsidiary's sole purpose is to serve as beneficiary or mortgagee in the land records, while the electronic registry was designed to track the transfer of beneficial ownership interests in and servicing rights to mortgage loans.

**Where things stand**

As the summer approaches, the housing finance industry is anticipating significant changes in housing policy designed to mend the loose practices that steered Fannie Mae and Freddie Mac into conservatorship. As the administration and Congress attempt to wind down the mortgage giants and attract private capital back into the markets, the inventory of homes for sale and pending shadow real estate–owned (REO) inventory continues to remain at record levels. In fact, the backlog of delayed foreclosures positions the economy to face a new record volume of foreclosures in 2011.

It was the spike in foreclosure activity in 2009 and 2010 that revealed false affidavits and other improper paperwork tied to foreclosures.

Some were carried out by "robo-signers." Others were executed with improper documentation. A few had even been carried out on the wrong house altogether. The discovery became the catalyst for a national foreclosure processing crisis that prompted several large servicers to temporarily suspend their foreclosure proceedings.

On some of those properties foreclosed with improper or incomplete paperwork, MERS was listed as the mortgagee or beneficiary of record. As a theretofore relatively unfamiliar entity, with the power to foreclose, the mortgage lien holder (MERS) unwittingly fanned the fires of the foreclosure crisis. Though numerous court rulings have since vindicated MERS, recognizing its authority to foreclose, many parties remain unconvinced.

During a self-imposed foreclosure moratorium, servicers revisited their loss-mitigation procedures and default-management practices. After conceding the challenges, many servicing institutions announced that additional remedies had been implemented to ensure that borrowers in default are evaluated for all available loss-mitigation options.

Further, servicers pledged that in the event of a foreclosure, their internal reviews had resulted in new operational procedures that would be meticulously followed in the future. But the consternation and uproar caused by the so-called Foreclosure-Gate has not yet fully settled.

That's not to say MERS has not been without some serious setbacks. On April 13, the results of an interagency horizontal examination conducted by federal regulators were released to the public. The report revealed a concerted effort by the Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC) and the Office of Thrift Supervision (OTS) to review the safety and soundness of mortgage servicing and foreclosure processes at 14 major mortgage servicers as well as a number of third-party vendors that provide significant services to lenders and servicers—including MERSCORP and MERS. The review has resulted in a formal consent order against the two entities.

This article reviews the establishment of MERS, documents its founding premise, explores how it has been used since 1995, evaluates its real impact on the foreclosure crisis, considers the impact of the consent order and shares a perspective on MERS' continued role in the future. The hope is that by providing this account the record will be set straight. **EXHIBIT ___5___**

**PAGE ___2___**

## Background

Originally conceived in the late 1980s, the concept for an electronic clearinghouse of critical mortgage information was explained in an October 1993 white paper entitled the *Whole Loan Book Entry [WLBE] Concept for the Mortgage Finance Industry.* The idea was developed by the InterAgency Technology Task Force (IAT), a group composed of prominent industry leaders—the Mortgage Bankers Association (MBA), Fannie Mae, Freddie Mac, Ginnie Mae and servicing executives.

Their vision was simple—use modem-based electronic data interchange (EDI) to allow mortgage loan sellers, warehouse lenders, mortgage loan investors and servicers to "obtain, transfer and track interests in mortgages, essentially on a real-time basis," regardless of any internal proprietary systems that supported their business operations.

Up until then, liens were tracked by local land records offices, with varying and often antiquated systems. Though seldom recognized, the purpose of the land records was not to track mortgage ownership rights, but to provide public notice of liens to protect the lien holder.

While other aspects of the mortgage lending supply chain were being digitized, including the 1990s development of automated underwriting systems (AUS) and loan origination systems (LOS), the recordation of the mortgagee or agent for the mortgagee in local land records remained a manual process.

Well-intentioned staff at bustling offices struggled to manage the congestion caused by the growing volume of mortgage loans. Missing and erroneous assignments caused gaps in the chain of title, threatening the integrity of the lending process. The late 20th-century prevalence of secondary market transactions and advancement of management information systems pushed the industry to pursue a more efficient solution.

## Process

Traditionally, the borrower executes two essential documents at closing. These two documents make up the mortgage loan. Although the legal distinction between them is fundamental, it is often overlooked in common parlance. The first document is the promissory note, which signifies the borrower's promise to repay the loan over a period of time under stated terms. Notes can technically exist without collateral, so the second document, the mortgage, secures the promissory note by placing a lien on the real property as security for the loan's repayment.

The note is typically endorsed "in blank" and delivered from the lender to the mortgage loan aggregator and/or securitization trust. The note is intended to be a fluid, negotiable instrument in trade where possession is sufficient to confer the right to enforce ownership interest.

The mortgage follows the note. That is to say that a transfer in the ownership of the promissory note also transfers with it the underlying secured obligation to pay.

Traditionally, when a loan was sold to another lender—for example, an aggregator—the mortgage was "assigned" to the purchaser and recorded in the purchaser's name. However, if the servicing remained with the seller, as was often the case, the mortgage usually continued to be recorded under the servicer's name.

The seller would then prepare a "recordable assignment in blank" and deliver it to the trust. Where MERS is the mortgagee of record, subsequent assignments of the mortgage no longer need to be recorded at the local recorders' offices because MERS holds the mortgage in trust on behalf of its member, who owns the note.

The land records have never been an authoritative source for who owns beneficial interests and servicing rights to mortgages. The assignment, which is usually recorded to protect the lien holder, is generally not required by the county, and has nothing to do with the sale of servicing rights. If the servicing rights changed hands, then the county land records were updated *if* the new servicer desired to receive service of process in order to fully perform under its servicing agreement with the investor. The advent of MERS enhanced this last step.

A predecessor to the current configuration of MERS and MERSCORP was officially created in 1995 as an industrywide utility to hold mortgage liens in an agency capacity on behalf of participants in the mortgage banking industry, and to track the changes in the ownership and servicing of any registered loan.

At closing, the lender and borrower make MERS the mortgagee of record, and all subsequent changes in the mortgage loan ownership and servicing rights of the loan are updated in the database provided the loan continues to be registered in the MERS System. Moreover, MERS was established as a part of a tri-party organization managed by the limited staff of MERSCORP, the lender participant and the founding agencies. Accordingly, all three legs of the tri-party stool contribute to the accuracy and maintenance of the registry in addition to serving as checkpoints.

The efficiencies realized by the registry provided incremental value to lenders that sold loans into the secondary market. Mortgage banking was a process that frequently required several assignments, and even before MERS, there was already an active attempt to minimize assignment costs and third-party fees. Lenders had already begun preparing mortgage assignments in blank to enable fluid transmissions, and attempted to immobilize mortgage notes at the original clearinghouse member custodian to avoid future file movement and recertification. These practices merely continued with the introduction of MERS.

> All three legs of the tri-party stool contribute to the accuracy and maintenance of the registry in addition to serving as checkpoints.

**EXHIBIT** 5
**PAGE** 3

### 'Vault' idea

Because the original WLBE system was closely modeled after the electronic stock and bond registration model implemented by the Depository Trust Company (DTC) a couple of decades earlier, some industry participants in the early 1990s suggested that loan documents, like physical stock and bond certificates, should also be stored in a vault. The idea of a central vault was one of many ideas circulated as the clearinghouse was being brainstormed, although it never became an official feature of the clearinghouse upon its official conception.

The vault idea was forgone presumably because loan document immobilization was already taking place. The Depository Trust and Clearing Corporation's (DTCC's) depository vaults, for instance, immobilized stock and bond certificates. As a result of electronic registrations and transfers, futures, options and bonds are now issued electronically.

But the vault idea did not totally disappear—the mortgage industry continued to pursue the vault concept with the advent of the electronic mortgage (eMortgage). Prior to conservatorship, both Fannie Mae and Freddie Mac pursued initiatives for the electronic storage of eMortgages originated and closed by their approved seller/servicers and signed electronically.

### Legal structure

MERS was designed to operate in accordance with existing real property law and the Uniform Commercial Code (UCC). MERS acts as mortgagee in the land records in a nominee (agent) capacity for the originating lender and the lender's successors and assigns.

The MERS System exists so MERSCORP knows who to send the service of process to because, under the MERS process, the current servicer continues to handle the day-to-day servicing responsibilities as it did prior to the advent of MERS.

When the underlying mortgage loan indebtedness (in the form of the promissory note) was sold from one lender to the next, the purchasing lender's interest would continue to be secured because MERS held legal record title for the benefit of the lender. MERS' role as agent for the promissory note owner in the land records is supported by both agency and contract law.

As mentioned earlier, it is not generally necessary to record an assignment to demonstrate mortgage loan ownership or convey a security interest. The benefit of recordation is to ensure that interested parties are apprised of existing liens or other legal encumbrances. Assignments are recorded so that subsequent servicers receive service of process for legal actions affecting the property that is encumbered by the lien.

Because mortgagee-of-record status renders MERS responsible to different parties in the mortgage loan ownership chain, contract agreements are prudently crafted between MERS, MERSCORP and third parties to establish loan ownership and security interests that retain the integrity of the original documents and have legal force.

### Legal challenges and victories

Up until the nation's foreclosure crisis emerged, MERS remained largely absent from the public eye. However, with the dawning of the Foreclosure-Gate crisis, the business model of MERS came under scrutiny.

The defects in servicer foreclosure procedures were admittedly serious, and included the robo-signing of affidavits and improper notarization, but investigations did not demonstrate that the vast majority of these foreclosures were otherwise invalid. Nevertheless, the legal right of MERS to commence foreclosure action came under fire in numerous states, where plaintiffs filed suits questioning MERS' authority to foreclose as an entity that was not the actual owner of the loan.

In October 2010, Washington, D.C. Attorney General Peter Nickles issued an enforcement statement declaring foreclosures may not be initiated against a District of Columbia homeowner unless the security interest of the current noteholder is also reflected in the local recorder's office.

As a relatively unknown entity with the power to foreclose, MERS and the MERS System became the focus of intense scrutiny. However, the past couple of years have unleashed a flood of cases in judicial and non-judicial foreclosure states that were adjudicated in MERS' favor.

■ *Utah:* Two March 2011 rulings *(Wade v. Meridias Capital Inc., MERS et al;* and *Wareing v. Meridias Capital)* in Utah, a non-judicial foreclosure state, have affirmed MERS' ability to act as the beneficiary of the deed of trust and nominee of the lender and its successors and assigns. The judges confirmed that this authority is conferred when a borrower signs a deed of trust on which MERS is expressly appointed the beneficiary. As such, mortgage assignments by MERS are valid and its execution of foreclosure is legal. These two cases were a small number of the many court decisions and orders in Utah that have upheld MERS' ability to be the beneficiary on a deed of trust and which dismissed challenges to MERS' authority to foreclose or assign.

■ *Wyoming:* A similar memorandum *(In re Martinez)* followed in March 2011 in Wyoming, where the authority of MERS relative to assigning a mortgage had likewise been contested. The argument failed because the borrower signed a mortgage at closing expressly authorizing MERS "to take any action required of the lender."

■ *California:* Also in March 2011, a plaintiff filed a claim under the California False Claims Act (CFCA), asserting MERS has made false representations in order to circumvent payment of recording fees required to reflect security interests in real property. The suit *(Bates v. MERS)* was dismissed by the District Court for the Eastern District of California, which determined it was without jurisdiction over the plaintiff's action because the plaintiff was not an original source of the information as required under the CFCA.

Further rulings recognizing MERS as the beneficiary of the mortgage or deed of trust, similar to those found in Utah and Wyoming, have also been made in Oregon, New York, Massachusetts, Georgia, New Hampshire, California, Alabama, Nevada, Virginia, Rhode Island, Michigan and Kansas this year. As the mortgagee of record

EXHIBIT 5
PAGE 4

and holder of the original note endorsed in blank, the cases support MERS' legal standing to initiate foreclosure proceedings.

Laurence E. Platt, a partner with K&L Gates LLP in Washington, D.C. with expertise in real estate finance who has worked on MERS issues over the years, acknowledges the significance of the rulings: "With favorable decisions in multiple states, it is clear that the basis for which MERS was founded is valid, and that MERS has the affirmation of the overwhelming majority of courts to act as the lender's nominee as provided in the mortgage documents," he says.

"MERS was created to enable efficiencies in a paper-based business. MERS continues to achieve its objectives, and if an entity like MERS did not exist today, it would have to be created to enable the efficient operation of the capital markets," Platt says.

> Although recent litigation has upheld the permissibility of MERS to commence foreclosure action, the practice is slated to come to an end where it has not already ended.

### Corporate governance challenges

While MERS' legal standing has been vindicated by state and district courts, its corporate governance structure recently came under the review of federal regulators. The *Interagency Review of Foreclosure Policies and Practices* and consent order for MERS were posted to the Federal Reserve Board's website on April 13.

In testimony before the Senate Committee on Banking, Housing and Urban Affairs on Feb. 17, 2011, Acting Comptroller of the Currency John Walsh explained to the Congress that an interagency examination of MERS' operations, procedures and controls had been under way.

The recent consent order between MERS and federal regulators follows several organizational changes already taking place within MERSCORP. On Jan. 22, 2011, R.K. Arnold, president and chief executive officer of MERS and MERSCORP, resigned. MERSCORP issued a statement on its website acknowledging the resignation and announcing an interim replacement. "MERSCORP Inc. . . . today announced the retirement of President and [Chief Executive Officer] R.K. Arnold. Arnold joined the company at its inception and has been instrumental in the development of the MERS System, a registry of ownership and other mortgage rights for more than half of all outstanding residential mortgages in the United States. . . . Arnold is succeeded on an interim basis by financial services industry veteran Paul Bognanno," the company announced. An announcement on a permanent successor has yet to be made.

While Walsh made general remarks on the review of MERS and MERSCORP in his testimony, he did not mention Arnold's resignation: "[T]he agencies [OCC, the Federal Reserve Board (FRB), FDIC, OTS] conducted interagency examinations of MERSCORP and its wholly owned subsidiary, Mortgage Electronic Registration Systems Inc. . . . which provide[s] significant services to support mortgage servicing and foreclosure processing across the industry. The primary objective of the examinations was to evaluate the adequacy of controls and governance over bank foreclosure processes, including compliance with applicable federal and state law. Examiners also . . . assessed foreclosure operating procedures and controls, interviewed bank staff involved in the preparation of foreclosure documents, and reviewed approximately 2,800 borrower foreclosure cases in various stages of foreclosure. Examiners focused on foreclosure policies and procedures, organizational structure and staffing, vendor management including use of third parties, including foreclosure attorneys, quality control and audits, accuracy and appropriateness of foreclosure filings, and loan document control, endorsement and assignment."

Many of the lapses in safety and soundness cited in the final interagency review were ascribed to servicer performance in the oversight and quality control of MERS. But the agencies also identified non-servicer-related deficiencies that presented "financial, operational, compliance, legal and reputational risks to MERSCORP and MERS, and to the participating members." When the consent order was issued, it was publicly announced that MERSCORP and MERS had already begun implementing remedial procedures.

Moving forward, MERSCORP and MERS have committed to the following actions:

■ Forming a compliance committee to monitor compliance with the terms of the consent order;

■ Formulating an action plan with a complete description of the actions necessary to comply with the order;

■ Engaging an independent third party to assess board, management, officer and staffing needs in order to operate safely and soundly;

■ Formulating a communications plan with members to establish a standard protocol for dealing with significant legal matters;

■ Formulating a governance plan to strengthen processes as they relate to authorizing MERS certifying officers; and

■ Obtaining an independent third party to review the effective operations of the eRegistry system of recording electronic notes.

Financial sanctions against MERSCORP and MERS were not imposed by regulators in the consent order.

### MERS: 'No more foreclosures in the MERS name'

Before the consent order was issued, a number of policy changes were announced by MERSCORP. The most notable was published in Policy Bulletin 2011-2 on March 8, 2011, announcing the revocation of member authority to commence foreclosures in the MERS name.

EXHIBIT 5
PAGE 5

According to the Policy Bulletin, the policy would become effective Aug. 1, 2011, upon approval by the board of directors of MERS and MERSCORP: "The authority to conduct foreclosures in the name of MERS granted to a member's certifying officers under the member's MERS Corporate Resolution is revoked. Effective Aug. 1, 2011, the member shall be sanctioned $10,000.00 per violation for commencing a foreclosure in the name of MERS. The member will automatically be in violation of this rule and subject to the enforcement of the fine when the first legal action is taken in MERS name."

Although recent litigation has upheld the permissibility of MERS to commence foreclosure action, the practice is slated to come to an end where it has not already ended. (Where the practice ends depends on servicer policy and/or whether the securities are Fannie and Freddie securitizations, not on market/jurisdiction.)

**Tri-party management allows swift policy change**
Concurrent with discussions over Policy Bulletin 2011-2, several major servicers, including Charlotte, North Carolina–based Bank of America, New York–based JPMorgan Chase and San Francisco–based Wells Fargo & Co. implemented internal policy changes requiring the de-registration of loans that were in the MERS name before initiating foreclosure. The purpose of the change was to provide clarity to the defaulted mortgagor and minimize legal and compliance risk to the servicer.

Furthermore, any Fannie Mae and Freddie Mac servicers that did not implement the policy on their own are now required to do so. That change was implemented via the following policy directives:

■ *Freddie Mac Bulletin 2011-5, March 23, 2011:* Eliminated the option of Freddie Mac servicers to foreclose in the MERS name. Going forward, the securitization must be assigned from MERS back to the servicer by means of recordation where required by law.

■ *Fannie Mae Announcement 2010-05, March 30, 2010:* MERS may not be named as the plaintiff of any mortgage loan owned or securitized by Fannie Mae. The servicer must prepare an assignment via recordation to transfer the security interest from MERS to the servicer. Effective May 1, 2010.

**The politics of MERS in the housing crisis**
Even as MERS turns the tide by prevailing in state courthouses around the country, the challenges the mortgage industry faces post-boom as a result of the widespread destruction of home values remains a political nightmare.

In addition to the agency consent order, a 50-state attorneys general (AG) task force contends it is negotiating a 27-point draft servicer settlement (or term sheet) with a handful of megaservicers. Conspicuously present in that draft agreement is language stating that the subject of MERS is held for separate review. It appears that the agency consent order has addressed the AG task force reference to MERS and its organizational structure.

The mention of MERS in the AG draft agreement signifies that its utilization may become a matter that is settled between servicers and regulators, rather than litigated or

legislated. In light of this possibility, in my view, the probability that MERS will end up a political casualty may be lowered.

**The ongoing need for an electronic registry**
By serving as the mortgagee in the county land records on behalf of its members, MERS has become a critical component of housing finance. Since its inception, MERS has enabled fluent commerce in the housing finance markets, much like the advent of electronic registration in lieu of stock certificates enabled fluent commerce in an age of trading stocks online.

The soundness of a borrower's property rights is far from compromised by the frugality of paperless business; instead, it is improved, as the enormous volume of mortgages issued and transferred could not be sustained by congesting the land records with reassignments.

In fact, the services of MERSCORP have not been exploited to their full, value-adding potential. If the traditional, paper-based format of the promissory note and the mortgage document were produced electronically (versus manually) at closing and registered within a single system like MERSCORP's MERS eRegistry, it would be virtually impossible to create duplicate notes.

The incidence of fraud would be reduced by the instant visibility conferred by a system like the MERS eRegistry. The legal underpinnings necessary to realize such a system have been in place since 2000, when the Clinton administration passed the Electronic Signatures in Global and National Commerce Act (E-SIGN), recognizing the equivalence of authenticity and enforceability between electronic and paper signatures.

In addition to federal law, 47 states and the District of Columbia have enacted Uniform Electronic Transactions Act (UETA) laws in their own statutes, acknowledging the validity of electronic signatures. The three remaining states—Illinois, New York and Washington—have adopted separate laws recognizing the validity of digital signatures as well.

Chris Christensen, an attorney with PeirsonPatterson LLP law firm in Dallas, has closely followed the foreclosure crisis. Christensen says, "The MERS® eRegistry is the key to solving the lost document problem. As a critical piece of eCommerce infrastructure, the eRegistry is also key to solving the industry's data problem. These two problems have largely contributed to the housing crisis. The good news is that they are not permanent problems if the industry acts now to implement the appropriate solutions. The MERS eRegistry is part of the solution and not the problem."

Christensen adds, "Had the industry focused on understanding the MERS value proposition with its electronic registry, we could have avoided the lost-document and data-based issues at the heart of the foreclosure crisis. But hindsight is always 20/20." **MB**

Allen H. Jones is chief operating officer of RiskSpan Inc., a mortgage valuation technology and advisory consulting services firm based in New York and Washington, D.C. He can be reached at ajones@riskspan.com.

EXHIBIT ___5___

PAGE ___6___

# COPYRIGHT INFORMATION



***Author:*** Jones, Allen H.

***Title:*** Setting the record straight on MERS

***Source:*** Mortg Bank 71 no8 My 2011 p. 34-6, 38-40
***ISSN:*** 0730-0212

***Publisher:*** Mortgage Bankers Association of America
1919 Pennsylvania Avenue, N.W., Washington, DC 20006-3438

The magazine publisher is the copyright holder of this article and it is reproduced
with permission. Further reproduction of this article in violation of the copyright is
prohibited.

This article may be used for research, teaching and private study purposes. Any substantial or systematic reproduction, re-distribution, re-selling, loan or sub-
licensing, systematic supply or distribution in any form to anyone is expressly forbidden. The publisher does not give any warranty express or implied or make
any representation that the contents will be complete or accurate or up to date. The accuracy of any instructions, formulae and drug doses should be independently
verified with primary sources. The publisher shall not be liable for any loss, actions, claims, proceedings, demand or costs or damages whatsoever or howsoever
caused arising directly or indirectly in connection with or arising out of the use of this material.

EXHIBIT __5__
PAGE __7__

1

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF WASHINGTON

LYUBOV YOVKO,                          )
                                       )
                    Plaintiff,         )   Case No. C11-0703CV
                                       )
        v.                             )
                                       )
NORTHWEST TRUSTEE SERVICES, INC.       )
as Successor Trustee; AMERICA'S        )
SERVICING as Loan Servicer; MORTGAGE )
ELECTRONIC REGISTRATION                )
SYSTEMS, INC., as Nominee for          )
Beneficiary; and HSBC BANK USA,        )
NATIONAL ASSOCIATION, as Trustee for )
the Holders of DEUTSCHE ALT-A          )
SECURITIES MORTGAGE LOAN TRUST,        )
SERIES 2006-AR1,                       )
                                       )
                    Defendant.         )

TRANSCRIPT OF PROCEEDINGS

BE IT REMEMBERED that the above-entitled

matter came on regularly for hearing before the

Honorable D. Charles Bailey, Judge of the Circuit Court

of the County of Washington, State of Oregon, commencing

at the hour of 9:52 a.m. on Monday, April 24, 2011.

APPEARANCES

     Mr. John P. Bowles
     Attorney at Law
     Appearing on behalf of the Plaintiff;

     Ms. Pilar C. French
     Mr. Rober J. Pratte
     Attorneys at Law
     Appearing on behalf of the Defendants.

2

1                           INDEX

2                                          PAGE NO.

3    Opening Statement by Mr. Bowles................4

4    Opening Statement by Mr. Pratte................18

5    Opening Statement by Ms. French................38

6                        WITNESS INDEX

7    VICTORIA SHAVLOVSKIY

8    Direct Examination by Mr. Bowles...............43

9    Cross-Examination by Ms. French................60

10   Cross-Examination by Mr. Pratte................78

11   Redirect Examination by Mr. Bowles.............92

12   Examination by the Court......................97

13                       EXHIBIT INDEX

14                          IDENT.   OFFERED   RECEIVED

15   Plaintiff's Exhibit No. 10     9
     (PSA)
16
     Plaintiff's Exhibit No. 11    45      57        57
17   (list of loan payments)

18   Plaintiff's Exhibit No. 13    46      49        49
     (5-1-09 notice of default)
19
     Plaintiff's Exhibit No. 14    48      49        49
20   (5-26-09 securitization loan info)

21   Plaintiff's Exhibit No. 15    50      51        51
     (1-27-10 accounting)
22
     Plaintiff's Exhibit No. 16    50      51        51
23   (1-25-10 notice of default)

24   Plaintiff's Exhibit No. 17    92      95        95
     (payment at closing)
25

3

|  | IDENT. | OFFERED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| Respondent's Exhibit No. 101 (hardship letter) | 64 | 65 | 66 |
| Respondent's Exhibit No. 102 (hardship letter) | 66 | | |
| Respondent's Exhibit No. 103 (posting of cash security) | 71 | 72 | 72 |

4

1                    P R O C E E D I N G S

2                    THE COURT:  State of Oregon versus Lyubov

3    Yovko versus Northwest Trustee Services, C11-0703CV.

4                    MS. FRENCH:  Says State of Oregon in

5    there.

6                    THE COURT:  You know, I may have.  I do

7    that every once in a while.

8                    MS. FRENCH:  Okay.  No crimes in this one.

9                    MR. PRATTE:  (Indiscernible audio.)  Pull

10   a chair up.

11                    (Indiscernible audio.)

12                    MR. BOWLES:  Your Honor, this is the

13   response to the opposition (indiscernible audio) last

14   week (indiscernible audio).

15                    (Pause in proceedings.)

16                    THE COURT:  All right.  I'll let you

17   begin.

18                    MR. BOWLES:  Thank you, Your Honor.

19                    OPENING STATEMENT

20   BY MR. BOWLES:

21                    Your Honor, we're here today to seek a

22   preliminary injunction on a TRO that was awarded

23   pursuant to a civil case that sought to stop a trustee

24   sale, nonjudicial foreclosure sale of the plaintiff's

25   home.

1    and seek a preliminary injunction prior to the

2    occurrence of the sale, according to the defendant's

3    reasoning is that we would be locked into, then, having

4    a sale occur, a conveyance occur, and then the only

5    issue then would be whether or not our clients were

6    entitled to damages, not whether they're entitled to

7    save their home.

8              And so consequently, once this nonjudicial

9    proceeding has begun -- or excuse me, the nonjudicial

10   foreclosure sale process has begun, the plaintiff has

11   been placed in a situation where they are either forced

12   to accept the consequences of the sale or initiate an

13   action which to stop it, based on the ultimate outcome

14   of what a sale would mean.

15             If the Court were to accept that they are

16   locked into accepting the consequences of a sale, they

17   cannot get a preliminary injunction prior to the sale,

18   then that would presume that the only relief that the

19   plaintiff is entitled to is one for damages; and we

20   would respectfully say that is not the intent of the

21   legislature.

22             Furthermore, Your Honor, the question here

23   before the Court is not necessarily one of whether they

24   can foreclose, but have they followed the statute as it

25   directs that they -- the sale must occur.  Mainly those

1    are under 86.75 subsection -- 86.735(1), whether or not

2    any assignments and all assignments have been recorded

3    as the assignment of the deed of trust within the public

4    record.  The second component under 86.735(2) is whether

5    or not there is a default.

6              Your Honor, in the deed of trust, MERS --

7    and I'm not sure if the Court has kept abreast as to

8    what is happening across the country with MERS, but MERS

9    as a party to this lawsuit is claiming that they are a

10   beneficiary under the deed of trust.

11             MERS, just for edification of the Court's

12   benefit, MERS is a private company which was formed and

13   is owned by members of the mortgage and real estate

14   industries, such as Bank of America, AIG, Sun Trust.

15   All of those entities have created this private company

16   that purportedly was created for the purpose of

17   electronically tracking the assignments of interest on

18   mortgages.

19             That -- the -- the reasons behind this, as

20   stated on the MERS website, is that it was for the

21   purpose of saving the mortgage industry of having to pay

22   the filing fees when they are -- excuse me, the

23   recording fees each time they would record these

24   assignments.  And so effectively, Judge, what we have

25   here is a private entity that has stepped in to replace

8

1     the public recording statutes.

2              The -- the -- the benefit to the real

3     estate industry for the creation of MERS was to

4     facilitate the transfer and the secondary market of

5     loans, the securitization and the sale of those loans on

6     a secondary market.

7              By not having to record each and every

8     assignment, MERS has purportedly stepped into the

9     position of being a beneficiary and they can -- they

10    essentially are treated as if they are having a whole

11    series of endorsements to the note.  The holder of the

12    note remains unknown, but MERS steps in the place and

13    says you're the only party that you have to deal with.

14    Essentially MERS has erected a curtain and the borrower

15    is forced to deal with who MERS delegates as the owner

16    of the note, and that's incorrect, Judge.

17              MERS is not a beneficiary under the deed

18    of trust, even though it says it is the beneficiary.  It

19    hasn't paid any value for the note, Your Honor.  It is

20    merely an entity out there that may, at best, act as an

21    agent of the beneficiary.

22              In the present case, we have assignment

23    from CR Pacific Mortgage, the originating lender; and

24    eventual assignment to HSBC, which is a securitized

25    trust, Judge.  If we are to assume for argument's sake

1    that HSBC owns that note and that the assignment -- or

2    excuse me, the recording of the assignment of the deed

3    of trust is accurate, then there are -- excuse me, that

4    that is -- that they -- excuse me.

5           The assignment of deed of trust that they

6    allege from CR Pacific to HSBC is -- is as they alleged,

7    there are unrecorded assignments, and here is why,

8    Judge.  The securitized trust, of which HSBC is the

9    trustee, has a pooling and servicing agreement which

10   dictates how loans are transferred into the trust.  And

11   that the transfer of those loans have to occur through a

12   certain process, namely they have to proceed given

13   the -- let's see.

14          As the originating lender, CR Pacific, the

15   PSA provides that the loans must be transferred to a

16   separate entity referred to as DB Structured Products,

17   Inc.  That sponsor, then, conveys the loan to a

18   depositor, a purchaser, which is Deutsche Alt-A

19   Securities, Inc.

20          Judge, if you can refer to our Exhibit 10,

21   the pooling and servicing agreement, Page 34 under the

22   PSA provides that the assignment or the endorsement of

23   that note would transfer to the sponsor or the seller,

24   DB Structured Products, Inc.

25          The second advance, Your Honor, would be

10

1    from -- would be from the sponsor/seller to the

2    depositor/purchaser, which is Deutsche Alt-A.  The

3    provisions under the PSA for that transaction are on

4    Page 15.  Finally, it is conveyed to HSBC as trustee for

5    Deutsche Alt-A Securities Mortgage Loan Series 2006-ARI,

6    and that's provided for on Page 35.

7              Your Honor, each and every one of those

8    conveyances must occur for a particular reason.  The

9    securitized trust is a conduit taxation vehicle.  The

10   IRS is very rigid in how it treats the transfer of

11   assets into that securitized trust.  The conveyances to

12   the depositor, DB Structured Products, Inc. and again to

13   Deutsche Alt-A Securities, Inc., are -- they're

14   conveyances that occur to protect the assets of the

15   trust in the event of bankruptcy.  So they are complete

16   conveyances.

17             But those conveyances, Your Honor, are not

18   recorded in the public records.  Why?  Because MERS is

19   holding itself out as the beneficiary.  It stands in

20   place of all of them, and none of those recordings under

21   the assignments of the deed of trust have occurred.

22             Those transfers of interest, Your Honor,

23   have to be recorded.  They were not.  There is no

24   successive recorded assignments between any of those

25   parties, and that's in violation of 86.73(1).

11

1            And if you'll see the Section 1 of the

2    mortgage loan purchase security -- purchase agreement of

3    the PSA whereby seller conveys to purchaser the mortgage

4    loans as of the closing date 1-31-06.  And I direct the

5    Court to Page 154 of the PSA.

6            These assets, Judge, have also -- are

7    required to be transferred to that trust according to

8    strict time lines.  Those assets have to be transferred

9    to the trust within the closing date, in this case which

10   is 1-31-06.

11           In the event that a loan becomes

12   nonconforming, say it goes into default, they have a

13   two-year window from the closing date in which to

14   replace that loan with a conforming loan.  All of these

15   events, Judge, would have to occur well prior to the

16   assignment that they recorded on May 29th of 2009, when

17   they said that the loan -- the assignment of the deed of

18   trust recorded from Sierra Pacific Mortgage to HSBC.

19           That is failing to take into account all

20   of the intervening entities that it had to be assigned

21   to and recorded, those conveyances that are not in the

22   public record; and they are outside the time frame by

23   which this asset could have been transferred to the

24   trust.

25           The trust is governed by New York law,

1       Your Honor, and in the event that this asset is not

2       transferred or the formalities are not followed

3       according to the terms of the PSA, then the conveyance

4       fails.

5               So in looking at -- and I understand,

6       Judge, this is going from the macro to the -- to the

7       specifics, but in the event that those assignments are

8       not properly recorded, then all the successive events

9       that have occurred such as the party that's claiming

10      that they can assign the deed of trust to a

11      successive -- to a successor trustee, to the successor

12      trustee in this case Northwest Trustee Services, which

13      alleges there's a default and issues a default, all of

14      those events fail.

15              They fail because they didn't have any

16      power at the time those purported documents were

17      executed.  They have no basis -- they have no impact on

18      the foreclosure process.

19              Furthermore, Judge, in looking at the --

20      in looking at the -- in looking at the actual assignment

21      of the deed of trust, which occurred on May 29th of

22      2009, the assignment is purportedly a trade between

23      Sierra Pacific Mortgage to HSBC when Sierra Pacific

24      Mortgage had no interest in which to convey at that

25      time.

1        If this asset were properly transferred

2   to the trust and is subject to the rules of a

3   securitized trust, then it has to be timely transferred

4   to the trust.  All the entities, the interceding

5   entities, have to be properly recorded in the public

6   record.

7        The timing of those recorded assignments

8   of the deed of trust have to relate to when the

9   endorsements of the note occurred.  When the sale of

10  that note occurred to these other parties, namely the

11  sponsor to depositor to the trust; as opposed to going

12  from the originating loan all the way to HSBC.

13        In addressing the position that MERS is

14  describing itself as a beneficiary, under the deed of

15  trust MERS references itself as a beneficiary.  They

16  cannot be a beneficiary.  The beneficiary in this case

17  is the originating lender.  We would -- we would -- my

18  client takes the position that MERS is an agent of the

19  beneficiary.

20        Why is that significant, Your Honor?  They

21  cannot exceed the powers of the principal as an agent.

22  And by cloaking themselves as a beneficiary, just

23  because they call themselves a beneficiary does not mean

24  that they are the beneficiary.

25        Under a deed of trust, Your Honor, that

1    enables them to conduct a nonjudicial foreclosure sale.

2    In the event that there is a default, it is the trustee

3    which assigns -- which essentially conducts the

4    nonjudicial foreclosure process.  And the beneficiary is

5    the originating lender.

6            MERS does not have legal title, as they

7    choose to assert.  That is a power that is delegated to

8    the trustee, the power of sale.  86.705(1) and (5)

9    address that the trustee has the power of sale, but the

10   beneficiary, Your Honor, does not.  And MERS cannot act

11   as both a beneficiary and a trustee in the process of

12   assigning these interests.  They have to be separate.

13           They can act as an agent of the

14   beneficiary, but they can't assume powers beyond the

15   original beneficiary.  So when that deed of trust was

16   assigned, Sierra Mortgage had no interest in which to

17   assign.  They -- there's nothing for them as an agent of

18   the beneficiary in which to assign.  They couldn't step

19   into the role of the beneficiary because they weren't

20   the beneficiary.

21           What should have happened is that each and

22   every one of those assignments from the sponsor to the

23   depositor to the trust should have been properly

24   recorded.  And MERS could act as the agent for each of

25   those transactions, provided they were done in a -- in

1     a -- a timely manner, commensurate with the sale of the

2     note along the way into this securitized trust.

3                 Your Honor, under 86.790, MERS also does

4     not qualify as a trustee, and that's where the exception

5     for them to operate as a trustee because they are

6     neither an attorney nor a financial institution nor a

7     trust company or a title company, United States or one

8     of its agencies or an escrow agent.

9                 And so again, MERS can't step into the

10    shoes of acting as a trustee because they're precluded

11    by statute.  They can't act as a beneficiary just

12    because they name themselves to be the trustee.  That's

13    the, you know, that's the example of argument tautology,

14    Your Honor.  That just because they say so it is so, and

15    that's not the case.  The statute is very, very clear

16    about that.  You can't have a beneficiary and a trustee

17    in the same position.

18                 Why are we in this position, Your Honor?

19    My client some months back had requested a loan

20    modification from her loan servicer, ASC.  And as is the

21    case in many households, there is also a marketing of

22    this -- of the HAMP benefits to loan modification by the

23    loan servicer when these people begin to experience

24    problems with their loan.

25                 Documents are sent out.  What should take

1    just a mere few months in which to do the calculations

2    to see whether or not they comply for the trial

3    modification program ends up being a process that drags

4    on for months and months and months, until finally it

5    appears that the loan servicer says you're not going to

6    get your loan modification and here's your default.

7              And today we're going to present evidence,

8    Judge, that the default notices they sent out are

9    grossly exaggerated when you look behind, you go in to

10   the trustee and you see what they were representing was

11   due to the investors of that trust.

12             Those default notices, Judge, had to have

13   a degree of accuracy if that's what they're going to do,

14   if they're going to declare a default.  And if they are

15   grossly inaccurate, then they failed to comply with the

16   statute of providing a default notice that the homeowner

17   is obligated to cure.

18             Grossly overstating the amount that they

19   must cure effectively renders the whole purpose of

20   having to pay off the mortgage moot because then a -- a

21   loan servicer or a trustee can just pick any figure that

22   is beyond the means of the homeowner and make a demand,

23   they don't pay, they get their home foreclosed on, and

24   that's it.  That's the end of the story.  They move out,

25   and then it's their case to make it for damages before

1    the Court in a subsequent suit.

2              In our present case, what happened is they

3    applied for a loan mod and the bank sent out various

4    default notices that were grossly overstated.  My

5    clients were given assurances that their loan

6    modification was in the process of review all the way up

7    until the point in time of the sale occurring.

8              And when they saw that the sale was still

9    continuing on even though they were given assurances

10   that a loan mod was going to occur or that it was in

11   process, and this is a statement being made by the loan

12   servicer, at the last moment on the day of the sale,

13   they were filing Chapter 13 to stop the sale, and this

14   happened twice.

15             And the statute, Your Honor, provides that

16   the sale must occur within 180 days.  On the last event

17   that this occurred, this was a Chapter 13, there was two

18   days left after the stay was lifted.  And the loan

19   servicer -- excuse me, the trustee sent out a

20   supplemental new notice that extends beyond the 180-day

21   period.

22             The statute is -- strictly construes that

23   180-day period, Judge, because if it wasn't a hard and

24   fast rule, the servicer and the trustee could just issue

25   a new notice at any point in time after the stay of a

18

1    bankruptcy has listed and regardless of how much time

2    has passed in the ensuing period, they can continue on

3    as if the 180-day period continued.

4                  Thank you, Judge.

5                  THE COURT:  Who wants to go for your side?

6                  MR. PRATTE:  Good morning, Your Honor.  My

7    name is Bob Pratte.  I'm with DLA Piper.  I'm admitted

8    here pro hac vice with my counsel, Pilar French from the

9    Lane and Powell.

10                     OPENING STATEMENT

11   BY MR. PRATTE:

12                  I'd like to start with, I think,

13   addressing a couple of preliminary issues.  I got a

14   little bit -- I got a little bit lost, so I kind of want

15   to go back to the basics a little bit on the injunction

16   standards.

17                  I think that the test for granting the

18   injunction is pretty well known.  It's the irreparable

19   harm, the public interest, the likelihood of success,

20   and the public policy.  And I think on those four

21   standards, I'm going to take a little bit of issue with

22   what opposing counsel said, starting with the very basic

23   question about losing the home.

24                  I am not -- I'm of the opinion that it's

25   not her home, since the address that she gives for

EXHIBIT  6
PAGE  17

1    because they wanted to bring in somebody else to argue

2    on the benefit of MERS.

3               The -- when she came into court, the judge

4    said 3,500 is sufficient security.  That is to maintain

5    the status quo, Judge.  We have a civil suit in which to

6    resolve these issues.  Anybody in default with their

7    bank, you can presume that all I can say is you're

8    behind, here's your default notice, we're going to

9    foreclose, and you have no basis in which to question

10   it.

11              Because following the defendant's

12   reasoning, we can't seek a TRO because we haven't been

13   damaged.  If -- it's only upon a sale is the final

14   resolution, Judge, and that means that they don't get to

15   keep the property.

16              THE COURT:  I disagree with the argument.

17   I mean, I don't have a problem with that, but I just --

18   I still think there's more --

19              MR. BOWLES:  Okay.

20              THE COURT:  Are you done, then?

21              MR. BOWLES:  One last point, Judge, is

22   that this is claimed to be owned by the securitized

23   trust.  The securitized trust is explicit in saying that

24   the assignments of the deed of trust and the mortgage,

25   and I point the Court to Page 23 where it says loans:

1    Mortgages and related mortgage notes each transferred

2    and assigned to the trustee pursuant to the provisions

3    herein (indiscernible audio) as from time to time are

4    held as part of the trust fund and identified in the

5    loan schedule (indiscernible audio).

6              THE COURT:  But that doesn't make who your

7    client owes.

8              MR. BOWLES:  I'm sorry, Judge?

9              THE COURT:  That doesn't make who your

10   client owes.  From -- from your client's perspective of

11   whether or not she's in default on her loan, what

12   difference does it make who she's in default to?

13             MR. BOWLES:  Judge, a debtor may have

14   claims of recoupment, may have claims of offset, may

15   have claims to the actual note.  But for one party to

16   stand in the middle and essentially cloud that ability

17   to deal with the ultimate creditor does complicate

18   things, Judge.

19             I mean, to the point where we're having to

20   go in here and say, okay, it's been assigned to a trust.

21   You have to go back in the trust schedule to see exactly

22   what the ultimate creditor is being paid.  That's

23   significant, Judge.

24             What is happening here is that MERS is

25   attempting to act as a beneficiary.  They're not a

1   beneficiary, Judge.  They have no basis to stand in the

2   position of a beneficiary.  They may be an agent, but

3   they are not the beneficiary.

4           It doesn't matter what the trust deed

5   says, Judge.  That was not a document my client drafted

6   and my -- and it's -- I think it's evidently clear that

7   my client does not have English fluency.  But just

8   because they say she's a beneficiary -- or that MERS is

9   a beneficiary does not make them the beneficiary.

10          So then it comes down to, Judge, who are

11  they dealing with.  Who ultimately are they dealing

12  with.  It says that the deed of trust is for the benefit

13  of Pacific Mortgage.  That -- that assignment when it

14  was assigned in 2009 didn't belong to them.  They have a

15  broken chain of title, Judge, and they're trying to

16  enforce a security agreement --

17          THE COURT:  Didn't -- didn't your client's

18  daughter know exactly who to talk to?

19          MR. BOWLES:  I'm sorry?

20          THE COURT:  Didn't your client's daughter

21  know exactly who to talk to regarding the loan?

22          MR. BOWLES:  Judge, they've been having to

23  deal with the servicer, and that's typically what

24  happens, is that the servicer is not --

25          THE COURT:  (Indiscernible audio) knew who

105

1    to talk to.

2                    MR. BOWLES:  But the servicer's not the

3    creditor.

4                    THE COURT:  All right.  You get five

5    minutes.

6                    MR. PRATTE:  Thank you, Your Honor.  And I

7    was just telling my cocounsel, you're the most patient

8    judge I've appeared before in 35 years.

9                    I think you're correct, Your Honor, on

10   the -- on the analysis of that they can't cure those

11   while she's in default.  I think it's -- it's beyond

12   question.  I think the simple math that I was doing and

13   which you confirmed supports the default.

14                   I think this -- this notion of MERS is not

15   the beneficiary, I think, is simply incorrect as a

16   matter of law.  They were a beneficiary -- they are --

17   you're right.  They are an agent.  Without question,

18   they are the agent of the lender, who successes and

19   assigns.  All they did is assign it to HSBC, which is by

20   their own admission the party that is the trustee for

21   the trust, not the trustee for the -- for the deed.

22                   So I think it is absolutely clear.  I

23   don't think there are any assignments out there that are

24   missing.  The securitization documents are, frankly,

25   irrelevant.  They don't have any bearing on who you pay

EXHIBIT ____6____
PAGE ____21____

1      the debt to.  Servicers are the only ones that have

2      staff to collect debts for.

3              If they want to assert a claim of

4      recoupment or anything else, I've been doing mortgage

5      banking 35 years.  They assert it against the servicers

6      all the time.  About the only one they can't assert is

7      rescission under Truth in Lending.  That has to go

8      against the owner of the debt.

9              But this is -- there's no rescission right

10     here because it's a purchase loan.  So that doesn't

11     apply in any event.  So I think it is -- I think it is

12     abundantly clear.  I don't think the standards for an

13     injunction have been met.

14             I will also say that -- and I will commit

15     to this Court that if there has been a mathematical

16     error in the calculation so that her payments have not

17     been credited or they were charged for late fees on real

18     estate taxes, I will commit to the Court we will

19     investigate that and make darn sure that didn't happen.

20     Because my understanding is those problems had been

21     resolved.

22             Because that would be -- that would be --

23     that would be completely wrong.  And I've represented

24     Wells Fargo for years.  Sure they make mistakes, like

25     anybody.  But that kind of mistake, if that happened,

EXHIBIT 6
PAGE 22

1    that's got to be fixed.

2            That would be credited to any amounts that

3    would be claimed, you know, under the -- under the deed

4    of trust.  That's a -- that's a matter of our talking to

5    the servicing people and getting that -- and getting

6    that straightened out.

7            I think Oregon law is very clear.  I think

8    MERS can be a beneficiary.  I think the courts are

9    recognizing it.  I think where some courts are

10   struggling is the notion as to whether it's an

11   assignment of the note, is that somehow an assignment of

12   the deed.  And I submit that it is not.  We're mixing up

13   two bodies of law.  Nowhere is that required.

14           And I think that's all I have to say, Your

15   Honor.  Thank you for your patience.

16           THE COURT:  To the Court, the MERS issue

17   is just essentially a red herring.  It's just a red

18   herring to the Court.  Really what this comes down to is

19   we have the borrower and a lender and they reach an

20   agreement, and both parties have to fulfill their ends

21   of that agreement.

22           And in the public policy in this area

23   would be, one, that people are allowed to fairly deal

24   with each other in these capacities and that people pay

25   back those loans.  It's -- it is a simple way of -- to

108

1    look at this.

2              I don't think that there's much success of

3    plaintiff being able to prevail on this particular

4    matter in the sense of clearly in default, clearly in

5    default by a significant amount of money.  And in

6    default in more than enough time that would allow for

7    whoever holds the -- basically the loan to default on

8    that loan and therefore do a nonjudicial foreclosure at

9    that point in time.

10             Therefore, the Court's finding that the

11   temporary restraining order or the injunction at this

12   point in time is going to be denied and if they want to

13   go forward with their foreclosure, they're allowed to do

14   so.  If there's any error after that, sue for damages

15   from that point.

16             MR. BOWLES:  Judge, just for

17   clarification's sake, are we saying that MERS is the

18   party to conduct the foreclosure?

19             THE COURT:  I'm saying the lender of the

20   loan is the person who can go forward and conduct the

21   foreclosure.

22             MR. BOWLES:  Thank you, Judge.

23             MR. PRATTE:  Thank you, Your Honor.  It's

24   been a pleasure.

25             (Court in recess, 12:28.)

109

1    STATE OF OREGON
                              ss.
2
     County of Multnomah
3

4         I, Susan Bulman, certified shorthand reporter,

5    hereby certify that I reported in stenotype all

6    testimony adduced and other oral proceedings had

7    from a CD recording in the foregoing transcript;

8    that thereafter my notes were reduced to typewriting

9    under my direction; and that the foregoing

10   transcript, pages 1 through 108, both inclusive,

11   contains the full, true, and correct record of all

12   such testimony adduced and oral proceedings had and

13   of the whole thereof to the best of my abilities.

14        Witness my hand at Portland, Oregon, this 26th

15   day of May, 2011.

16

17

18

19   _____
                 Susan Bulman, RDR, CSR
20               Registered Diplomate Reporter

21

22

23

24

25

EXHIBIT ___6___
PAGE ___25___